NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 26-1168
(Consolidated with Nos. 26-1174, 26-1188, 26-1193, 26-1202)

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

HEATING, AIR CONDITIONING & REFRIGERATION DISTRIBUTORS, et al.,
*Petitioners*,
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

ON PETITION FOR REVIEW OF FINAL ACTION OF THE
ENVIRONMENTAL PROTECTION AGENCY

# JOINT PROOF OPENING BRIEF OF NATURAL RESOURCES DEFENSE COUNCIL AND STATE AND LOCAL GOVERNMENT PETITIONERS

ANDREA JOY CAMPBELL
Attorney General
JULIA JONAS-DAY
Assistant Attorney General
JON WHITNEY
Special Assistant Attorney General
Energy and Environment Bureau
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
Julia.Jonas-Day@mass.gov
Jon.Whitney@mass.gov

*Counsel for Commonwealth of Massachusetts*

JULIA K. FORGIE
Natural Resources Defense Council
1314 Second Street
Santa Monica, CA 90401
(310) 434-2351
jforgie@nrdc.org

DAVID D. DONIGER
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
(202) 289-6868
ddoniger@nrdc.org

*Counsel for Natural Resources Defense Council*

ROB BONTA
Attorney General
DAVID ZAFT
Supervising Deputy Attorney General
MEGAN K. HEY
KEITH BAUERLE
Deputy Attorneys General
Environmental Justice & Protection Section
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6000
Megan.Hey@doj.ca.gov
Keith.Bauerle@doj.ca.gov

*Counsel for State of California*

NICHOLAS W. BROWN
Attorney General
TALIA O. THUET
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, WA 98504-0117
(360) 586-6770
Talia.Thuet@atg.wa.gov

*Counsel for State of Washington*

*Additional Counsel Listed on Signature Page*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties

Petitioners:

**26-1168**: Heating, Air Conditioning & Refrigeration Distributors International ("HARDI"), Plumbing-Heating-Cooling Contractors National Association, Air Conditioning Contractors of America.

**26-1174**: Air-Conditioning, Heating, and Refrigeration Institute ("AHRI"), Alliance for Responsible Atmospheric Policy.

**26-1188**: Natural Resources Defense Council ("NRDC").

**26-1193**: Commonwealth of Massachusetts, State of California, State of Washington, State of Colorado, District of Columbia, State of Delaware, State of Hawai'i, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New York, City of New York, State of Oregon, State of Rhode Island, State of Vermont, State of Wisconsin ("State and Local Governments").

**26-1202**: Alta Refrigeration, Inc., Coalition for the Use of Safe and Efficient Refrigerants.

Respondents:

**26-1168, 26-1174, 26-1188, 26-1193, 26-1202**: U.S. Environmental Protection Agency and Lee Zeldin in his official capacity as Administrator of the Environmental Protection Agency.

Intervenors for Respondents:

**26-1168**: Alta Refrigeration, Inc., American Frozen Food Institute, Coalition for the Use of Safe and Efficient Refrigerants, Food Marketplace, Inc. National Grocers Association, Retail Litigation Center.

### B. Rulings under review

All Petitioners filed timely challenges to the May 26, 2026, final rule of the Administrator of the U.S. Environmental Protection Agency ("EPA") published in the Federal Register at 91 Fed. Reg. 31,284 (May 26, 2026) ("Rule"), entitled "Phasedown of Hydrofluorocarbons: Reconsideration of Certain Regulatory Requirements Promulgated Under the Technology Transitions Provisions of the American Innovation and Manufacturing Act of 2020."

### C. Related cases

Counsel are not aware of any related cases. *Food Marketplace, Inc. v. EPA*, No. 23-1347 (D.C. Cir.), addresses the rule that preceded the Rule at issue here, 88 Fed. Reg. 73,098 (Oct. 24, 2023). That case was argued and is being held in abeyance.

## TABLE OF CONTENTS


CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .......... iii

TABLE OF CONTENTS .......... v

TABLE OF AUTHORITIES .......... vii

GLOSSARY .......... x

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 2

ISSUES PRESENTED .......... 2

STATUTES AND REGULATIONS .......... 3

STATEMENT OF THE CASE .......... 3

SUMMARY OF THE ARGUMENT .......... 5

STANDING .......... 6

STANDARD OF REVIEW .......... 10

ARGUMENT .......... 12

I. EPA's Consideration of Statutory Factors is Unlawful .......... 12

A. EPA's consideration of availability of substitutes is contrary to the record, unsupported, and does not justify the Rule .......... 12

B. EPA's consideration of economic costs and environmental impacts is unlawful .......... 19

C. EPA failed to adequately consider the remaining phasedown period .......... 28

II. EPA Failed to Adequately Consider States' Reliance Interests .......... 29

III. EPA Acted Contrary to Law by Failing to Provide an Effective Date One Year from Publication ....................30

IV. This Court Should Vacate the Challenged Provisions of the Rule ...............31

CONCLUSION ....................32

# TABLE OF AUTHORITIES

## Cases

*Air All. Houston v. EPA*,
906 F.3d 1049 (D.C. Cir. 2018)....................................................................31

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993)......................................................................31

*Cigar Ass'n of Am. v. FDA*,
964 F.3d 56 (D.C. Cir. 2020)................................................................. 20, 21

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)......................................................................................29

*Competitive Enterprise Inst. v. NHTSA*,
901 F.2d 107 (D.C. Cir. 1990)........................................................................9

*Ctr. for Biological Diversity v. NHTSA*,
538 F.3d 1172 (9th Cir. 2008) ............................................................. 27, 28

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020).................................................................................. 19, 20, 30

*Diamond Alternative Energy v. EPA*,
606 U.S. 100 (2025)......................................................................................10

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)......................................................................................11

* *FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)............................................................... 11, 13, 16, 17

*Fred Meyer Stores, Inc. v. NLRB*,
865 F.3d 630 (D.C. Cir. 2017)......................................................................16

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*,
528 U.S. 167 (2000)........................................................................................6

*Gerber v. Norton*,
294 F.3d 173 (D.C. Cir. 2002)......................................................................21

*Grecian Magnesite Mining, Indus. & Shipping Co., SA v. Commissioner*,
926 F.3d 819 (D.C. Cir. 2019)........................................................................31

*Kennecott Corp. v. EPA*,
684 F.2d 1007 (D.C. Cir. 1982)......................................................................11

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)........................................................................... 11, 31

*Massachusetts v. EPA*,
549 U.S. 497 (2007)...........................................................................................7

*Mo. Pub. Serv. Comm'n v. FERC*,
337 F.3d 1066 (D.C. Cir. 2003)......................................................................18

* *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)........................................................................... 11, 21

*Nat'l Lifeline Ass'n v. FCC*,
921 F.3d 1102 (D.C. Cir. 2019)......................................................................14

*New Jersey v. EPA*,
989 F.3d 1038 (D.C. Cir. 2021)........................................................................9

* *NRDC v. Wheeler*,
955 F.3d 68, 77 (D.C. Cir. 2020)........................................................ 7, 10

*Orangeburg, S.C. v. FERC*,
862 F.3d 1071 (D.C. Cir. 2017)......................................................................14

*Sw. Airlines Co. v. FERC*,
926 F.3d 851, 856 (D.C. Cir. 2019)...............................................................29

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019)......................................................................31

**Statutes**

42 U.S.C. § 7607 ............................................................................ 2, 10

* 42 U.S.C. § 7675 ............................................ 2, 3, 7, 10, 12, 20, 28, 30, 31

5 U.S.C. § 706 ....................................................................................................31

**Rules**

* 88 Fed. Reg. 73,098 (Oct. 24, 2023)................................................ 1, 3, 7, 16, 29

* 91 Fed. Reg. 31,284 (May 26, 2026).............................. 1, 2, 4, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 27, 28, 29, 30, 31

**Other Authorities**

Saleem S. Saab, Comment, *Move Over Drugs, There's Something Cooler on the Black Market—Freon: Can the New Licensing System Stop Illegal CFC Trafficking?*, 16 Penn. State Int'l L. Rev. 633 (1998)...................................26

*Authorities chiefly relied upon are marked with an asterisk

## GLOSSARY

| | |
|---|---|
| AIM Act | American Innovation and Manufacturing Act, 42 U.S.C. § 7675 |
| HFC | Hydrofluorocarbon |
| Impacts Memo | Memorandum: Analysis of Economic and Environmental Impacts – Phasedown of Hydrofluorocarbons: Reconsideration of Certain Regulatory Requirements Promulgated Under the Technology Transitions Provisions of the American Innovation and Manufacturing Act of 2020, EPA-HQ-OAR-2025-0005-0520-01 |
| The Rule | Phasedown of Hydrofluorocarbons: Reconsideration of Certain Regulatory Requirements Promulgated Under the Technology Transitions Provisions of the American Innovation and Manufacturing Act of 2020, 91 Fed. Reg. 31,284 (May 26, 2026) |
| 2023 rule | Phasedown of Hydrofluorocarbons: Restrictions on the Use of Certain Hydrofluorocarbons Under the American Innovation and Manufacturing Act of 2020, 88 Fed. Reg. 73,098 (Oct. 24, 2023) |
| EPA | U.S. Environmental Protection Agency |
| NRDC | Natural Resources Defense Council |
| State and Local Government Petitioners | Commonwealth of Massachusetts, State of California, State of Washington, State of Colorado, District of Columbia, State of Delaware, State of Hawai‘i, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New York, City of New York, State of Oregon, State of Rhode Island, State of Vermont, State of Wisconsin |

## INTRODUCTION

Congress passed the American Innovation and Manufacturing Act ("AIM Act") to reduce emissions of harmful hydrofluorocarbons ("HFCs"), a class of chemicals used as refrigerants. HFCs are potent greenhouse gases, with up to thousands of times the climate warming impact of carbon dioxide. The Act directs the Environmental Protection Agency ("EPA") to phase down domestic HFC supply, maximize HFC reclamation and minimize waste, and accelerate the transition to HFC alternatives.

EPA's three tasks work together: While requiring significant contractions in supply of new HFCs, EPA is to preserve existing supply through refrigerant management regulations and to protect the market from price shocks with technology-transitions regulations. Consistent with that design, EPA's 2023 "Technology Transitions" rule decreased HFC demand alongside the statutorily mandated decrease in supply and protected the waning supply for uses lacking adequate alternatives. 88 Fed. Reg. 73,098 (Oct. 24, 2023) ("2023 rule") (reproduced at JA___). Among other things, the rule set deadlines in 2026 and 2027 to limit installation of new HFC-containing equipment in supermarket systems, remote condensing units, and cold storage facilities.

Just three years later, EPA has reversed course, delaying those deadlines to 2032. 91 Fed. Reg. 31,284 (May 26, 2026) ("the Rule") (reproduced at JA___).

EPA did so despite a record showing that alternatives are widely available and in use and that the delay will increase both emissions and costs. These delays are contrary to law and arbitrary and capricious. This Court should vacate them and restore the supply-and-demand balance the AIM Act envisioned.

## JURISDICTIONAL STATEMENT

On July 20, 2026 (Case No. 26-1188) and July 21, 2026 (Case No. 26-1193) respectively, NRDC and State and Local Government Petitioners ("Government Petitioners") timely sought review of EPA's Rule, published at 91 Fed. Reg. 31,284 (May 26, 2026). Because the Rule is nationally applicable, this Court has jurisdiction to review it under 42 U.S.C. § 7607(b)(1). *See* 42 U.S.C. § 7675(k)(1)(C) (applying 42 U.S.C. § 7607(b)(1) to AIM Act rules).

## ISSUES PRESENTED

(1) Whether EPA acted unlawfully by inadequately considering, or failing to consider altogether, requisite statutory factors—including availability of substitutes, overall economic costs and environmental impacts, and the remaining HFC supply phasedown period—when delaying deadlines for limiting the installation of new HFC-containing equipment, which much of industry is already meeting.

(2) Whether EPA's deadline delays are arbitrary and capricious because the agency failed to consider important reliance interests.

(3) Whether EPA acted contrary to law by making the Rule effective 60 days from publication despite a one-year statutory minimum.

## STATUTES AND REGULATIONS

The addendum ("ADD") contains relevant statutes and regulations.

## STATEMENT OF THE CASE

Congress enacted the AIM Act, 42 U.S.C. § 7675, to establish an orderly phasedown of harmful climate super pollutants. Among other things, the Act sets a schedule for phasing down HFC supply, *id.* § 7675(e)-(g), and authorizes EPA to set demand-side regulations to accelerate the transition of new equipment to low-global-warming-potential HFC alternatives, *id.* § 7675(i). In developing the demand-side, technology-transitions regulations, EPA must "factor in" the best available data, the availability of substitutes, overall economic costs and environmental impacts, and the remaining phasedown period for HFCs under the supply-side regulations. *Id.* § 7675(i)(4). EPA must also provide a one-year lead time before its rules become effective. *Id.* § 7675(i)(6).

In 2023, EPA issued demand-side regulations that, among other things, restricted new installations of certain HFC-containing equipment in supermarket systems, remote condensing units, and cold storage facilities beginning in 2026 or 2027. 88 Fed. Reg. at 73,098. But three years later, EPA extended those deadlines until 2032, claiming purported changes in the agency's understanding of

availability of substitutes and overall economic costs and environmental impacts. 91 Fed. Reg. at 31,284, 31,294-96.

In this reversal, EPA conceded that HFC substitutes are available and in use in all three sectors. *Id.* at 31,294-96, 31,306, 31,316. EPA also prepared a memorandum, "Analysis of Economic and Environmental Impacts" ("Impacts Memo"), which showed the Rule would increase demand for HFCs, leading to increased HFC prices and increased emissions. JA___ [Impacts_Memo_15]. However, EPA expressly disclaimed reliance on that Memo, 91 Fed. Reg. at 31,287, despite referencing it repeatedly, *see, e.g.*, *id.* at 31,324. EPA also declined to consider the supply-side HFC phasedown schedule, calling it "wholly separate." *Id.* at 31,304-05. And EPA did not address states' reliance interests, despite comments from state attorneys general highlighting those interests. JA___ [State_Comments_22-23].

EPA issued this Rule in May and made it effective just 60 days later. 91 Fed. Reg. at 31,284. NRDC and Government Petitioners challenged the Rule's deadline delays for supermarket systems, remote condensing units, and cold storage warehouses; a broad industry coalition also challenged the delays. NRDC and Government Petitioners refer the Court to the Brief of Petitioners in consolidated cases 26-1168 and 26-1174 ("HARDI et al. Br.") for a comprehensive statement of the case.

## SUMMARY OF THE ARGUMENT

EPA's deregulatory action to delay compliance deadlines for supermarket systems, remote condensing units, and cold storage warehouses is contrary to law and arbitrary and capricious.

**I.** EPA's consideration of statutory factors is unlawful. First, EPA claims its delays are appropriate in part because of purported changes in the availability of substitutes. But the record shows, and EPA concedes, that substitutes are widely available and in use for each of the subsectors at issue—indeed, more are available now than when EPA issued the 2023 rule. EPA's stated concerns that building codes may constrain use of those substitutes are also contradicted by the record. EPA's delays are therefore arbitrary and capricious.

Second, EPA points to overall economic costs and environmental impacts to justify some of its delays. But its analysis of costs and environmental impacts is contained in its Impacts Memo, on which EPA expressly disclaims reliance. Having disclaimed that analysis, EPA cannot show it "factor[ed] in" these considerations. Moreover, the Memo contradicts EPA's rationale for the delays. The Memo and other record evidence show the Rule will cause demand for HFCs to grow while supply shrinks, raising prices for all HFC users. EPA touts cost savings for new supermarkets, but its own data reveal that existing supermarkets using HFCs will face higher costs that will far outweigh the savings for new stores.

Similarly, the Memo shows HFC emissions will rise with greater demand. And it understates the Rule's emissions impacts. Since its only economic and environmental analysis contradicts EPA's stated rationale, the agency has not provided a reasoned explanation for the Rule.

Third, EPA has not factored in the remaining HFC phasedown schedule. Its refusal to do so is contrary to law, and to the extent it did consider the phasedown schedule, its consideration is unreasoned and arbitrary and capricious.

**II.** In addition to failing to consider industry reliance interests, *see* HARDI et al. Br., EPA also failed to respond to important reliance interests of states that depended on the 2023 rule to meet their own greenhouse gas emission reduction targets.

**III.** EPA acted contrary to law because it made its deadline delays effective after just 60 days, rather than after one year as the Act requires.

Because of these errors, this Court should vacate the Rule's deadline delays for supermarkets, remote condensing units, and cold storage units.

## STANDING

NRDC and Government Petitioners have standing. The Rule will cause more HFC emissions and higher HFC prices, which will harm Petitioners in multiple ways that are redressable by a favorable decision. *See Friends of the Earth, Inc. v.*

*Laidlaw Envt'l Servs.*, 528 U.S. 167, 180-81 (2000); *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007).

In *NRDC v. Wheeler*, this Court found that both NRDC and New York had standing to challenge an EPA rollback of HFC regulations because it would "lead to an increase in HFC emissions, which will in turn lead to an increase in climate change, which will threaten petitioners' coastal property." 955 F.3d 68, 77 (D.C. Cir. 2020). Just so here. EPA estimates the Rule will increase HFC emissions by the equivalent of 68 million metric tons of carbon dioxide by 2050.[1] JA___ [Impacts_Memo_15]. Those emissions will worsen impacts of climate change, harming NRDC's members and Government Petitioners.

As noted in *Wheeler*, 955 F.3d at 77, NRDC member Paul Jeffrey "owns coastal property in New Jersey that is especially vulnerable to weather events caused or worsened by climate change." *See also* ADD028-37 [Jeffrey_Decl. ¶¶ 2-11, 13-15] (documenting damage from Superstorm Sandy and increasingly frequent flooding and rising home insurance rates). Other NRDC members will experience health and property harms from increasing frequency of extreme heat

---

[1] The AIM Act assigns an "exchange value" to each listed HFC, 42 U.S.C. §7675(c)(1), which is equal to each chemical's global warming potential in relation to carbon dioxide. EPA's regulations express the HFC supply caps established by 42 U.S.C. §7675(e) in million metric tons of exchange value equivalent, which equals million metric tons of carbon dioxide equivalent. *See* 88 Fed. Reg. at 73,104, 73,106 n.29.

and intensity of storms. ADD025-26 [Elwood_Decl. ¶ 8]; ADD044-45 [Phillips_Decl. ¶¶ 13-14].

Likewise, Government Petitioners will suffer harms to their proprietary interests because rising sea levels and extreme weather will damage city and state property.[2] The Rule will also harm their quasi-sovereign interests because increased climate effects will increase damage to private property, disruption to industries, and threats to residents' health and wellbeing.[3]

Government Petitioners will also incur higher costs preparing for and recovering from extreme climate events and long-term climate change.[4] The Rule

---

[2] *See, e.g.*, ADD166-70, 186-87 [Laramee_Decl. ¶¶ 26-32, 58-61]; ADD315 [Antos_Decl. ¶ 37]; ADD385-90, 407-08 [Potosnak_Decl. ¶¶ 15-21, 57-61]; ADD496-98 [Fleishman_Decl. ¶¶ 36-40, 42]; ADD619, 621-23 [Lazorchak_Decl. ¶¶ 36-38, 42-46]; ADD663-65, 676-77 [Yeung_Decl. ¶¶ 27-31, 51-55].

[3] *See, e.g.*, ADD081-94, 100-01, 121-22 [Scheehle_Decl. ¶¶ 12-25, 30, 54]; ADD127-43 [Ogletree_Decl. ¶¶ 12-27, 30-32]; ADD209-14, 216-17 [Kibbey_Decl. ¶¶ 23-31, 34-38]; ADD223-39, 241-53, 262 [Curran_Decl. ¶¶ 10-37, 41-48, 51-63, 80]; ADD278-83 [Hoagland_Decl. ¶¶ 25-40]; ADD344-65, 372-74 [Kohlasch_Decl. ¶¶ 10-35, 44-48]; ADD413-17 [McEvoy_Decl. ¶¶ 8-18]; ADD426-55 [Seth_Decl. ¶¶ 21-36, 38-64]; ADD517-22 [Mirzakhalili_Decl. ¶¶ 8-15, 18-22]; ADD528-48, 550-52 [Gray_Decl. ¶¶ 11-42, 47-52]; ADD630-42, 644-46 [Creswell_Decl. ¶¶ 14-28, 32-37]; ADD656-62, 676-77 [Yeung_Decl. ¶¶ 15-26, 53-55].

[4] *See, e.g.*, ADD089-90, 093-98, 102-04, 121-22 [Scheehle_Decl. ¶¶ 21, 24, 26, 28, 32-34, 54]; ADD169-74, 176-87 [Laramee_Decl. ¶¶ 31-38, 42-61]; ADD258-61 [Curran_Decl. ¶¶ 75-78]; ADD394-400, 407-08 [Potosnak_Decl. ¶¶ 32-42, 57-61]; ADD426-27, 456-58, 462-66, 468-72 [Seth_Decl. ¶¶ 21-24, 66-68, 76-81, 85-88]; ADD510-13 [Goldfarb_Decl. ¶¶ 21-28]; ADD673-77 [Yeung_Decl. ¶¶ 47-55].

will also pose regulatory burdens on Government Petitioners. *See New Jersey v. EPA*, 989 F.3d 1038, 1047-48 (D.C. Cir. 2021). States with statutory greenhouse gas emission reduction mandates will also need to expend resources on further regulatory actions to limit emissions to offset the Rule's emission increases.[5] And some states with their own technology-transitions regulations will have to devote increased resources to enforcement and to educating the regulated industry. *See* ADD145-46 [Ogletree_Decl. ¶¶ 37-38]; ADD647-48 [Creswell_Decl. ¶¶ 43-44].

EPA's Rule will also harm NRDC's members and Government Petitioners through increased HFC prices. *See Competitive Enterprise Inst. v. NHTSA*, 901 F.2d 107 (D.C. Cir. 1990) (finding standing due to increasing costs). Delaying transition deadlines will cause HFC demand to outpace supply, leading to what EPA anticipates will be a 12-24 percent increase in HFC prices by 2029 and similar increases thereafter. JA___, ___ [Impacts_Memo 10, 15]; ADD052-53, 057-63 [Dougherty_Decl. ¶¶ 6, 14-21].[6] This will result in higher costs for groceries and home air-conditioning maintenance. *See infra* Arg. I.B.2; ADD052-

---

[5] *See, e.g.*, ADD116-18 [Scheehle_Decl. ¶¶ 44-48]; ADD144-45 [Ogletree_Decl. ¶¶ 35-36]; ADD187-92 [Laramee_Decl. ¶¶ 62-68]; ADD217-19 [Kibbey_Decl. ¶¶ 39-43]; ADD337-40 [Lamb_Decl. ¶¶ 8-19]; ADD374-76 [Kohlasch_Decl. ¶ 49-55]; ADD408-10 [Potosnak_Decl. ¶¶ 62-68]; ADD646-47 [Creswell_Decl. ¶¶ 38-42].

[6] EPA has likely significantly underestimated the market disruption from the Rule. ADD121-22 [Scheehle_Decl. ¶ 54].

53 [Dougherty_Decl. ¶ 6]; ADD040-43 [Phillips_Decl. ¶¶ 4-8, 12]; ADD023-25 [Elwood_Decl. ¶¶ 4-7]; ADD118-20 [Scheehle_Decl. ¶¶ 49-50]. And Government Petitioners will need to spend more to refill HFC-containing air-conditioning equipment in state-owned facilities.[7]

Vacatur of the challenged provisions will redress these injuries by reducing HFC emissions, keeping demand aligned with the statutorily mandated decreases in HFC supply, and avoiding HFC price increases. *See Wheeler*, 955 F.3d at 77; *Diamond Alternative Energy v. EPA*, 606 U.S. 100, 113-20 (2025) (applying "commonsense economic principles" to evaluate causation and redressability for "downstream . . . economic injuries").[8]

## STANDARD OF REVIEW

Under the AIM Act, this Court must set aside EPA action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9); *see id.* § 7675(k)(1)(C) (making Clean Air Act judicial

---

[7] ADD073-74 [Lambeth_Decl. ¶¶ 5-8]; ADD120-21 [Scheehle_Decl. ¶¶ 51-53]; ADD193-94 [Laramee_Decl. ¶¶ 69-72]; ADD196-98 [Judd_Decl. ¶¶ 5-11]; ADD266-68 [League_Decl. ¶¶ 7-13]; ADD376-77 [Kohlasch_Decl. ¶¶ 56-62]; ADD672-73 [Yeung_Decl. ¶ 45].

[8] *Wheeler* also found that NRDC has associational standing to vindicate its members' interests because the issues raised are germane to its mission and participation by individual members is unnecessary. *See* 955 F.3d at 77 (finding NRDC challenge to HFC rule rollback germane to its purpose because of NRDC's commitment "to reducing emissions of greenhouse gases" and specifically reducing HFC pollution); *see also* ADD048-49 [Trujillo_Decl. ¶¶ 8-10].

review provisions applicable to AIM Act rules). Agency action is "not in accordance with law" if it is contrary to statutory mandates. *See, e.g.*, *Kennecott Corp. v. EPA*, 684 F.2d 1007, 1013 (D.C. Cir. 1982). When interpreting statutory mandates, courts exercise "independent judgment" using "traditional tools of statutory construction." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403, 412 (2024).

Agency action is arbitrary and capricious when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (agency decision is arbitrary and capricious if agency fails to rationally connect its choice to the facts).

An "agency changing its course . . . is obligated to supply a reasoned analysis for the change," *State Farm*, 463 U.S. at 42, and must "provide a more detailed justification than what would suffice for a new policy created on a blank slate . . . when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

# ARGUMENT

## I. EPA's Consideration of Statutory Factors is Unlawful

The AIM Act requires that EPA "to the extent practicable . . . factor in," "the best available data," the "availability of substitutes," "overall economic costs and environmental impacts," and "the remaining phase-down period for regulated substances" when issuing technology-transitions regulations. 42 U.S.C. § 7675(i)(4)(A)-(D). EPA asserts that its deadline delays for supermarkets, remote condensing units, and cold storage units are appropriate in light of one or more of these factors. But its unsupported rationales render the delays arbitrary and capricious. And in some instances, EPA has acted contrary to law by failing altogether to consider a statutorily mandated factor. For each of these reasons, EPA's delays are unlawful.

### A. EPA's consideration of availability of substitutes is contrary to the record, unsupported, and does not justify the Rule

EPA purports to base the challenged delays in part on changes in its understanding of the availability of substitutes. *See* 91 Fed. Reg. at 31,294 (supermarkets), 31,295 (remote condensing units), 31,296 (cold storage). But these rationales are unsupported and, in many instances, contradicted by the record. EPA has provided no reasoned explanation for changing its position from three years

before, where the record was nearly identical. *See Fox Television*, 556 U.S. at 515-16. These flaws render the delays arbitrary and capricious.

*Supermarket Systems*

EPA has not identified any changes regarding the availability of substitutes that warrant delaying the transition deadlines for supermarkets. EPA's claims that certain retailers "may require additional flexibility" and that there may be "potential challenges with building code adoption," 91 Fed. Reg. at 31,294; *see also id.* at 31,303, 31,305-06, are unsupported and contrary to the record.

EPA does not present evidence undermining its 2023 conclusion that multiple substitutes would be available by 2027. *See* 91 Fed. Reg. at 31,305 (explaining that the 2023 rule found "several" available substitutes and noting EPA's 2024 decision listing six acceptable substitutes). Indeed, "the best available data" contradict EPA's assertions. Commenters submitted evidence that thousands of stores have already transitioned to non-HFC-containing equipment. *See, e.g.*, JA___ [NRDC_Comment_6]. And multiple commenters identified examples of substitutes in use today. 91 Fed. Reg. at 31,306; *see, e.g.*, JA___-___ [NRDC_Comment_6-7]; *see also* JA___ [AHRI_Comment_15]; JA___ [AAON_Inc._Comment_4]. Moreover, in this Rule, EPA concedes that substitutes *do* exist, *id.* at 31,303, 31,306, and are being used, *id.* at 31,304, 31,306. The agency even acknowledges that "market pressure and the advantages of the new

refrigerants" will encourage use of alternatives before 2032, all but conceding there is no need for such a delay. *Id.* at 31,306.

With no evidence of changed availability of substitutes, EPA falls back on unsupported requests for more time from a small number of supermarket retailers, who say the deadline delays will give them more time and flexibility to install compliant equipment. *Id.* at 31,306-07. But EPA has not substantiated its appeal to preserving "optionality and flexibility." *Id.* at 31,306. Beyond taking those retailers' word for it, the agency never explains why flexibility or more time "may" be necessary. "[S]uch an unadorned explanation does not suffice." *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1087 (D.C. Cir. 2017). That is particularly true where the delay undermines the very purposes of the AIM Act's technology-transitions provisions: avoiding price spikes by keeping demand-side HFC reductions in balance with the supply-side phasedown. *See supra* Stmt. of Case; *see Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1111-14 (D.C. Cir. 2019) (failure to consider the impact of a proposed change on the primary purpose of a program or otherwise explain how it is compatible with that purpose is arbitrary and capricious).

EPA attempts to brush aside the availability of substitutes by stating that was only one of multiple factors EPA may consider in issuing this Rule. 91 Fed. Reg. at 31,306. But having said it relied on this factor, EPA cannot justify disregarding the

record evidence of available substitutes by claiming to have considered other factors, too. *Id.* at 31,294, 31,306. Such inconsistent reasoning is arbitrary and capricious.

The only justification EPA offers for the blanket deadline extension for supermarkets is its assertion that there are obstacles in some locations to using the two most applicable substitutes. EPA says carbon dioxide refrigeration systems may not be energy efficient in very hot areas, and certain other low-global-warming-potential refrigerants may not be allowed under some cities' building codes. *Id.* at 31,303, 31,308.

The record does not support this justification. Both types of substitutes are "in use" already. *Id.* Many commenters provided evidence that carbon dioxide systems are more energy efficient than current systems even in hot climates. *Id.* at 31,306-07. And EPA itself explains that jurisdictions have seen "rapid adoption" of building code updates allowing the other low-impact alternatives, *id.* at 31,309, and acknowledges comments noting that 49 states allow their use "either through code updates, legislation, or interpretive letter," *id.* at 31,308. In addition, EPA excludes carbon dioxide systems from its building code concerns. Commenters also described how entities could overcome any remaining local building code restrictions and comply with the 2023 rule's 2027 compliance deadline. JA___-___ [AHRI_Comment_15-17]; JA___ [AAON_Inc._Comment_4]; JA___

[Chemours_Comment_15]. And the Impacts Memo continues to assume as part of its baseline modeling scenario that new supermarkets would successfully transition to one of these substitutes by that 2027 deadline. JA___ [Impacts_Memo_24-25]. In short, despite even more evidence supporting EPA's 2023 conclusion that building codes do not pose an impediment to the adoption of HFC alternatives by 2027, *see* 88 Fed. Reg. at 73,160, EPA reaches the opposite conclusion. 91 Fed. Reg. at 31,294, 31,309. EPA's conclusions do not reflect the best available data, and the agency's failure to explain its departure from its prior factual findings is arbitrary and capricious. *See Fox Television*, 556 U.S. at 515-16.

If EPA had rationally concluded that *neither* carbon dioxide *nor* other low-impact alternatives could be used in some jurisdictions, it might have had grounds to exempt those areas. But that would not have justified a nationwide five-year delay. Without more, EPA's explanation is "more disingenuous than dispositive." *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017).

*<u>Remote Condensing Units</u>*

Similar flaws render EPA's delay of deadlines for remote condensing units arbitrary and capricious. EPA has not substantiated its claimed changes in understanding of "the availability of substitutes" for this subsector. 91 Fed. Reg. at 31,295. Instead, the record and the agency's own observations support EPA's 2023 conclusions about the availability of substitutes. EPA acknowledges substitutes are

available and that six more were approved for use in 2024, *id.* at 31,313, that many U.S. manufacturers are already producing compliant units to meet the January 1, 2026, deadline, *id.* at 31,312, and that building codes are not a universal constraint in this subsector, *id.* at 31,314. EPA concedes that its observations about building code updates for safety concerns are not new—they also existed in 2023. *Id.* at 31,315. The agency also concedes there has been "rapid adoption" of building code updates to allow for these substitute refrigerants. *Id.* at 31,314. In its Impacts Memo, EPA excludes carbon dioxide systems from its building code and safety concerns and concedes that building codes do not present challenges to compliance for the other substitutes. JA___, ___ [Impacts_Memo_26, 71]; *see also* 91 Fed. Reg. at 31,312 (agreeing that in most cases, these units do not face the same asserted building code challenges as supermarket systems). As with supermarkets, then, EPA could only justify a deadline exception for areas where none of the substitutes could be used.

EPA again falls back on purported uncertainties about whether retailers "may" need additional time to familiarize themselves with non-HFC technology and technicians "may" require additional training. 91 Fed. Reg. at 31,314. But particularly where EPA has previously found industry could comply with the 2026 deadlines, unsubstantiated concerns like these do not justify a six-year delay. *See Fox Television*, 556 U.S. at 515 (agency must "provide a more detailed

justification" when its factual findings "contradict those which underlay its prior policy"). Nor can EPA avoid substantiating its availability-of-substitutes rationale by vaguely alluding to reasons "other than" the availability of substitutes. 91 Fed. Reg. at 31,314. If EPA says its delay is based on availability of substitutes, it must support that rationale and explain its deviation from past findings. Its failure to do so here is arbitrary and capricious.

*Cold Storage*

The same flaws apply to EPA's delay of the cold storage deadlines. Again, EPA has not supported its reliance on purported "changes in our understanding of the availability of substitutes" to justify the deadline delay. *Id.* at 31,296. In the Rule and the Impacts Memo, EPA acknowledges that over 90 percent of cold storage warehouses already use ammonia or carbon dioxide. *Id.* at 31,316; JA___ [Impacts_Memo_42]. For that reason, EPA concedes, the delay will have minimal impact on product manufacturing and current use of refrigerants. 91 Fed. Reg. at 31,318; *see also* JA___ [Impacts_Memo_22] (maintaining projections that cold storage systems would comply with the 2023 rule deadlines). "Reliance on facts that an agency knows are false at the time it relies on them"—or, as here, reliance on fabricated uncertainty—"is the essence of arbitrary and capricious decisionmaking." *Mo. Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1075 (D.C. Cir. 2003).

Although EPA recognizes that certain warehouses may choose not to use ammonia in densely populated areas, EPA does not explain why carbon dioxide would be cost prohibitive or otherwise infeasible for those facilities. *See* JA___ [Impacts_Memo_42]. EPA mentions "building code constraints," but concedes building code adoption is not a sector-wide barrier or universal constraint. 91 Fed. Reg. at 31,296, 31,317. Even if EPA showed there were areas where none of the available substitutes can be used, that would justify an exception, not a blanket delay.

Finally, like the other subsectors, EPA's attempt to sidestep its availability-of-substitutes rationale by alluding to other "reasons" for its delay is unavailing. *Id.* at 31,317. EPA's failure to justify its delay on "the grounds that the agency invoked" renders the rule arbitrary and capricious. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020).

### B. EPA's consideration of economic costs and environmental impacts is unlawful

EPA also claims the delays for supermarkets and remote condensing units are appropriate because of "overall economic costs and environmental impacts." 91 Fed. Reg. at 31,294 (supermarkets); *id.* at 31,295 (noting economic costs regarding

remote condensing units).[9] But EPA fails to provide a reasoned analysis explaining why those factors counsel in favor of delay.

To begin, EPA fails to "factor in" "overall economic costs and environmental impacts." 42 U.S.C. § 7675(i)(4)(C). This statutory directive requires EPA to conduct a genuine analysis. *See Cigar Ass'n of Am. v. FDA*, 964 F.3d 56, 63 (D.C. Cir. 2020) (finding rule arbitrary and capricious because FDA failed to analyze a factor the statute required it to "tak[e] into account"). But EPA expressly disclaims its only analysis of the Rule's economic and environmental impacts—the Impacts Memo. EPA states this analysis is "descriptive and for informational purposes only," "not part of the rationale for reaching the decisions in this final rule," and "not . . . a record basis for the final action." 91 Fed. Reg. at 31,287. Without that Memo, the record of EPA's consideration of "overall economic costs and environmental impacts" is limited to vague assertions crediting industry concerns, such as the alleged "need for additional flexibility," *id.* at 31,294, and "the burden" of transitioning, *id.* at 31,295. *See Regents of the Univ. of Cal.*, 591 U.S. at 20 ("[J]udicial review of agency action is limited to the grounds that the agency invoked." (cleaned up)). And while EPA claims that it

---

[9] EPA does not even attempt to justify its delays for cold storage units on this ground. Nor could it, as nearly the entire sector has already transitioned away from HFCs. 91 Fed. Reg. at 31,316; JA___ [Impacts_Memo_42].

"qualitatively weighed environmental benefits as opposed to quantifying them," 91 Fed. Reg. at 31,326, the Rule lacks any evidence of such weighing. To "factor in" these considerations must mean more than merely to recite them. *See Cigar Ass'n of Am.*, 964 F.3d at 61 ("[S]tating that a factor was considered . . . is not a substitute for considering . . . it." (quoting *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002))). By failing to "factor in" economic costs and environmental impacts, EPA has acted contrary to law.

Even if EPA had relied on the Impacts Memo, the delays would be arbitrary and capricious. The Memo's data and analysis contradict EPA's claim that the delays are appropriate in light of costs and environmental impacts. Indeed, the Memo validates commenters' concerns that the Rule will increase both costs and emissions. Moreover, it understates those harms. Thus, as discussed below, EPA's rationale "runs counter to the evidence" and is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

*Cost Increases*

EPA's Impacts Memo shows that delaying standards for supermarkets, remote condensing units, and cold storage facilities will increase demand for HFCs in those subsectors. JA___ [Impacts_Memo_12]. The Memo indicates direct engineering cost savings for new systems within those subsectors of $976 million

over the next 25 years, compared to the 2023 rule—equal to $56 million on an annualized basis.[10] But the Memo also projects that increased demand will raise HFC prices by 12-24 percent in 2029 in all HFC-using subsectors. JA___ [Impacts_Memo_15 Tbl. ES-7].

Simple math using the data in the Memo shows that HFC cost increases for *existing* supermarkets due to the price increases will outweigh the projected cost savings for *new* supermarkets. Based on EPA's data, existing supermarkets will pay roughly $68 to $137 million to replace refrigerant leakage in 2029 because of this Rule, far exceeding the $56 million annualized direct cost savings projected for *new* supermarkets.[11] Thus, the Rule will lead to higher overall costs for supermarkets. And contrary to EPA's claim that the Rule will lower grocery bills because supermarkets would pass on cost *savings* to consumers, 91 Fed. Reg. at 31,286-87, it is safe to conclude grocery costs will rise as supermarkets pass on these cost *increases*.

---

[10] The annualized value reflects constant annual values summing to the cumulative value, discounted at three percent. JA___ [Impacts_Memo_6].

[11] This is based on multiplying the number of HFC-using existing stores (95 percent of 45,575, JA___ [EPA-HQ-OAR-2025-0005-0519_attachment_18.pdf_4]); the amount of refrigerant they will need to replace, *see* JA___ [Impacts_Memo_49 Tbl. 2-1] (average-sized supermarket uses 1,111 kg refrigerant and has 15 percent annual leak rate); and the increase in price for that refrigerant, *see* JA___, ___ [Impacts_Memo_62 Tbl. 4-1, 76, App. D] (estimating 12-24 percent price increase in 2029 under the Rule, resulting in $88-98/kg instead of $79/kg).

The Rule does not grapple with these net cost increases or reconcile them with its assertion that delay is appropriate. Indeed, EPA "agrees with commenters" that HFC prices will shift due to rising demand, but claims the "extent" of cost increases is "unclear." 91 Fed. Reg. at 31,324. The Impacts Memo notes that because of increased HFC demand, HFC prices will rise for downstream users, including beyond the regulated subsectors. Contrary to the claim that these increased costs will "*partially* offset" the direct cost savings for new supermarkets, JA___ [Impacts_Memo_4] (emphasis added), the record shows they will *more than* offset those savings, JA___, ___ [Impacts_Memo_12, 15].

EPA points vaguely to market "measures" and other unspecified factors that may affect HFC prices and usage, JA___ [Impacts_Memo_13], but EPA does not and cannot assert that those measures will prevent price increases. Without this analysis, EPA's claims of cost savings from the Rule are meaningless and contradicted by its own data.

Nor has EPA examined other indirect impacts of these price increases on consumers. As the Impacts Memo concedes, refrigerant prices will rise for all other HFC-using subsectors, including their consumers. Costs for repairing air-conditioning systems, for example, will rise for companies that service millions of homeowners and commercial and government building owners. EPA did not assess

the extra costs imposed on these companies and their customers or compare them to the Rule's claimed direct cost savings.

*Environmental Impacts*

The Impacts Memo's emissions analysis also contradicts EPA's rationale for delay and arbitrarily understates the harmful effects of the Rule. According to the Memo, the Rule will increase annual HFC emissions from supermarkets, remote condensing units, and cold storage warehouses; push total HFC consumption 24 percent above the supply limit for 2029; and result in a cumulative increase in emissions equivalent to 68 million metric tons of carbon dioxide. JA___, ___, ___ [Impacts_Memo_11 Tbl. ES-6, 10 Tbl. ES-5, 15 Tbl. ES-7].

EPA does not reconcile these analytical results with its conclusion that the delay is appropriate in light of "environmental impacts." The agency says only that it "disagrees with commenters who state that this rule will *necessarily* result in increased GHG emissions." 91 Fed. Reg. at 31,325 (emphasis added). That does not suffice.

Contrary to EPA's speculation, *id.* at 31,326, the HFC supply cap does not prevent the rise in emissions due to the demand-side deadline delays. According to the Memo, under the 2023 rule, total HFC demand was expected to be significantly less than the supply cap through 2028 and again from 2032 to 2034. JA___ [Impacts_Memo_14]. When demand is below the supply limit, HFC consumption

(and therefore emissions) will only be as high as demand. By increasing HFC demand, the Rule could result in increased consumption and emissions at least up to the supply cap. Moreover, EPA speculates that in years when demand exceeds the supply cap, there may be increased reliance on HFCs that were stockpiled when demand was below the supply cap. 91 Fed. Reg. at 31,324. EPA's assumptions suggest that increased demand for HFCs will lead to additional production or importation of HFCs and thus even higher emissions relative to the 2023 rule.

EPA's analysis also ignores other factors that will increase emissions. Commenters noted that HFC price increases will incentivize the import of more foreign-made air conditioners and other products already filled with HFCs, which in turn will increase the amount of HFCs eventually emitted in this country. *See, e.g.*, JA___-___ [Trane_Technologies_Comment_5-6]; JA___-___ [Hillphoenix-Dover_Comment_9-10]; JA___-___ [NRDC_Comment_9-10]. Yet, as the Memo acknowledges, EPA's emissions projections "do not account for the share of demand that may be met in the form of 'pre-charged' [imported] equipment." JA___ [Impacts_Memo_12 n.12].

Also, as commenters pointed out, an increase in demand will encourage more *illegal* imports of HFCs. JA___-___ [Solstice_Comment_7-8]. Smuggling of illegal prohibited chemicals has been a major problem in the United States since

the Clean Air Act phaseout of chlorofluorocarbons (HFC predecessors) began three decades ago. *Id.* Due to the misalignment of supply and demand in the 1990s, illegal chlorofluorocarbon imports became the *second-most valuable* contraband imported into the United States, after illegal drugs.[12] EPA deflects concerns that the Rule will create a similar black market for HFCs by referencing federal authorities' efforts to reduce smuggling. JA___ [Response_to_Comments_491]. But EPA does not deny that higher domestic HFC prices will encourage more smuggling or claim that interdiction can fully prevent it. Illegal imports that get through customs barriers add to U.S. emissions. EPA's emissions analysis—which already contradicts the rationale for the Rule—is incomplete because it omits these important aspects of the problem.

*Costs of Emissions Impacts*

In the 2023 rule, EPA used a peer-reviewed methodology for the "social cost of greenhouse gases" to monetize the health and environmental benefits of the rule's HFC emission reductions. EPA estimated the rule would produce $3 to $52 billion in public health and environmental benefits between 2025 and 2050. 88

---

[12] *See* Saleem S. Saab, Comment, *Move Over Drugs, There's Something Cooler on the Black Market—Freon: Can the New Licensing System Stop Illegal CFC Trafficking?*, 16 Penn. State Int'l L. Rev. 633, 634 (1998), https://insight.dickinsonlaw.psu.edu/cgi/viewcontent.cgi?article=1441&context=psilr.

Fed. Reg. at 73,100-01. Here, in contrast, EPA has declined to calculate the social cost of the emission increases from this Rule, instead asserting the AIM Act does not require such analysis and an Office of Management and Budget memorandum prohibits it. 91 Fed. Reg. at 31,325. Neither assertion is availing.

The social cost methodology was developed over 15 years ago in response to a Ninth Circuit decision faulting another agency for assigning a zero-dollar value to the benefit of reducing carbon dioxide emissions. *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1199-1203 (9th Cir. 2008). The court rejected the contention that uncertainty prevents monetizing those benefits. *Id.* at 1200 ("[W]hile the record shows that there is a range of values, the value of carbon emissions reduction is certainly not zero."). Tabulating emissions is not enough; as one commenter here put it, rationally considering "environmental impacts" requires considering "the physical and economic consequences of those emissions." JA___-___ [IPI_Comment_5-6] (emphasis omitted).

EPA acknowledges this Rule will have "[f]orgone benefits." 91 Fed. Reg. at 31,286 Tbl. 1. But it failed to monetize those emission impacts, repeating the error the Ninth Circuit found arbitrary and capricious.

The Office of Management and Budget memorandum does not excuse this shortcoming. That memorandum summarily directed that agencies "should not monetize [greenhouse gas emission] impacts," claiming "the uncertainties" are

"too great." JA___ [Jeffrey_Bossert_Clark_Memo_3]. Alluding to contrary court decisions, it urged agencies to "consider [their] options under the nonacquiescence doctrine." *Id.* But an unreasoned dictate from the Office of Management and Budget is not itself a rational basis for EPA's reversing position, abandoning methods to monetize emission reduction benefits, and treating HFC reduction benefits as valueless. *See Ctr. for Biological Diversity v. NHTSA*, 538 F.3d at 1199-1200. And EPA has provided nothing more. By counting cost savings but not forgone environmental benefits, EPA arbitrarily tips the scales in favor of deregulation.

### C. EPA failed to adequately consider the remaining phasedown period

EPA also declined to "factor in" "the remaining phase-down period for [HFCs]." 42 U.S.C. § 7675(i)(4)(D). Commenters expressed concerns that the delays conflict with the HFC phasedown and will result in "a much greater demand . . . than allowed production can support." 91 Fed. Reg. at 31,305. But EPA brushes these concerns aside, asserting that "the phasedown schedule Congress established in subsection (e) . . . is wholly separate from the Technology Transitions provisions in subsection (i)." *Id.* This refusal to "factor in" the phasedown is contrary to law.

Even if EPA did "factor in" the phasedown schedule, its consideration is arbitrary and capricious. Contrary to the Rule's assertions, *see id.*, the phasedown schedule "is an important factor" in developing technology-transitions regulations because the programs are "complementary": technology-transitions regulations "support[] innovation," "advance[] the adoption of substitutes where available," and "reduc[e] demand" for the waning supply. *See* 88 Fed. Reg. at 73,140. As commenters warned, technology-transitions regulations that fail to consider the phasedown schedule could create price shocks, supply shortages, and other negative impacts for consumers. *See* 91 Fed. Reg. at 31,305. Instead of considering how to mitigate these risks, EPA merely notes that the deadlines need not align and offers conclusory assurances. *See id.* at 31,305, 31,317. In doing so, EPA fails to articulate a rational "consideration of the relevant factors." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Moreover, EPA's unexplained change in position about the relevance of the phasedown schedule to subsection (i) is arbitrary and capricious. *See Sw. Airlines Co. v. FERC*, 926 F.3d 851, 856, 859 (D.C. Cir. 2019).

## II. EPA Failed to Adequately Consider States' Reliance Interests

Government Petitioners detailed how the Rule's delays would upset reliance interests in numerous states with targets for reducing refrigerant and overall greenhouse gas emissions. JA___ [State_Comments_22-23]; *see also supra*

Standing. By increasing HFC emissions, the Rule will make these state targets harder to meet. The Rule preamble does not respond at all to these concerns. EPA's Response to Comments offers only the non-sequitur that "the AIM Act does not preempt states from setting more stringent restrictions." JA___ [Response_to_Comments_444]. This observation does not constitute meaningful consideration of states' reliance interests. *See Regents of the Univ. of Cal.*, 591 U.S. at 30. The "agency's job" is to assess the existence and strength of any reliance interests and weigh them against competing policy concerns. *Id.* at 31-32. EPA did no such weighing here, further rendering the Rule arbitrary and capricious.

## III. EPA Acted Contrary to Law by Failing to Provide an Effective Date One Year from Publication

The Rule is also "not in accordance with law" because it violates the AIM Act's requirement that: "[n]o rule under this subsection may take effect before the date that is 1 year after the date on which the Administrator promulgates the applicable rule under this subsection." 42 U.S.C. § 7675(i)(6). EPA does not deny that the Rule is a "rule under this subsection." 91 Fed. Reg. at 31,301. But EPA made it effective after only 60 days. *Id.* at 31,284.

To attempt to justify its premature effective date, EPA invents a definition of "applicable rule" that appears nowhere in the text: "a rule that creates new

restrictions for a particular sector or subsector." *Id.* at 31,301. The statutory text forecloses this definition, and EPA's various policy arguments cannot save it. *See Loper Bright*, 603 U.S. at 403 ("Courts interpret statutes, no matter the context, based on the traditional tools of statutory construction, not . . . policy preferences.").

The phrase "applicable rule" in the latter clause of section 7675(i)(6) refers to the first clause: a "rule [promulgated] under this subsection." *Cf. Grecian Magnesite Mining, Indus. & Shipping Co., SA v. Commissioner*, 926 F.3d 819, 824 (D.C. Cir. 2019) (describing nearest-reasonable-referent canon). Because this Rule was promulgated "under this subsection," 91 Fed. Reg. at 31,287-88, 31,300-01, it cannot take effect for one year after publication.

## IV. This Court Should Vacate the Challenged Provisions of the Rule

Vacatur is the ordinary remedy for unlawful agency action. *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (citing 5 U.S.C. § 706(2)); *see Air All. Houston v. EPA*, 906 F.3d 1049, 1053 (D.C. Cir. 2018) (vacating EPA's arbitrary and capricious chemical disaster delay rule). This case presents no reasons to depart from that standard practice. "The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc.*

*v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (citation modified).

As explained above, the Rule suffers from many serious deficiencies. EPA failed to adequately consider statutorily mandated factors, reached conclusions contrary to and unsupported by the record, and failed to justify its about-face just three years after issuing a rule on a nearly identical record. A proper assessment of statutory factors and consideration of the record before the agency would almost certainly lead to a different result.

This is not a case where vacatur would worsen human health and the environment. To the contrary, vacatur would protect those interests. Nor would vacatur cause substantial disruption because industry was already on notice of the January 2026 and January 2027 deadlines and most of industry was already meeting or prepared to meet them. The Rule itself has caused substantial disruption by creating market uncertainty and an imbalance in supply and demand. Vacating the challenged provisions would accordingly reduce disruption by returning industry to the status quo, thus bringing HFC demand back into alignment with the AIM Act's supply-side deadlines.

## CONCLUSION

This Court should vacate the challenged provisions of the Rule.

Respectfully submitted this 19th day of October, 2026.

*/s/ Julia K. Forgie*
Julia K. Forgie
Natural Resources Defense Council
1314 Second Street
Santa Monica, California 90401
(310) 434-2351
jforgie@nrdc.org

David D. Doniger
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
(202) 289-6868
ddoniger@nrdc.org

*Counsel for Natural Resources Defense Council*

**STATE OF CALIFORNIA**
ROB BONTA
ATTORNEY GENERAL

*/s/ Megan K. Hey*
MEGAN K. HEY
KEITH BAUERLE
Deputy Attorneys General
DAVID ZAFT
Supervising Deputy Attorney General
Environmental Justice & Protection Section
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, California 90013
(213) 269-6000
Megan.Hey@doj.ca.gov
Keith Bauerle@doj.ca.gov

**COMMONWEALTH OF MASSACHUSETTS**
ANDREA JOY CAMPBELL
ATTORNEY GENERAL

*/s/ Julia Jonas-Day*
JULIA JONAS-DAY
Assistant Attorney General
JON WHITNEY
Special Assistant Attorney General
Energy and Environment Bureau
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
(617) 727-2200
Julia.Jonas-Day@mass.gov
Jon.Whitney@mass.gov

**STATE OF WASHINGTON**
NICHOLAS W. BROWN
ATTORNEY GENERAL

*/s/ Talia O. Thuet*
TALIA O. THUET
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, Washington 98504-0117
(360) 586-6770
Talia.Thuet@atg.wa.gov

**STATE OF COLORADO**
PHILIP J. WEISER
ATTORNEY GENERAL

*/s/ Carrie Noteboom*
CARRIE NOTEBOOM
Assistant Deputy Attorney General
PHALEN KOHLRUSS-REUMAN
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, Colorado 80203
(720) 508-6000
Carrie.Noteboom@coag.gov
Phalen.Kohlruss@coag.gov

**THE DISTRICT OF COLUMBIA**
BRIAN L. SCHWALB
ATTORNEY GENERAL

*/s/ Caroline S. Van Zile*
CAROLINE S. VAN ZILE
Solicitor General
Office of the Attorney General for the
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
Caroline.Vanzile@dc.gov

**STATE OF DELAWARE**
KATHLEEN JENNINGS
ATTORNEY GENERAL

*/s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
RALPH K. DURSTEIN III
VANESSA L. KASSAB
Deputy Attorneys General
ROBIN L. JACOBS
Assistant Attorney General
Delaware Department of Justice
820 North French Street
Wilmington, Delaware 19801
(302) 683-8899
Vanessa.Kassab@delaware.gov

**STATE OF HAWAIʻI**
ANNE E. LOPEZ
ATTORNEY GENERAL

*/s/ Lyle T. Leonard*
LYLE T. LEONARD
Deputy Attorney General
State of Hawaiʻi
Department of the Attorney General
465 South King Street, Room 200
Honolulu, Hawaiʻi 96813
(808) 587-3050
Lyle.T.Leonard@hawaii.gov

**STATE OF ILLINOIS**
KWAME RAOUL
ATTORNEY GENERAL

*/s/ Jason E. James*
JASON E. JAMES
Assistant Attorney General
Matthew J. Dunn
Chief, Environmental Enforcement/
Asbestos Litigation Division
Joanna Brinkman
Complex Litigation Counsel
Illinois Attorney General's Office
201 W. Pointe Drive, Suite 7
Belleville, Illinois 62226
(217) 843-0322
Jason.James@ilag.gov

**STATE OF MAINE**
AARON M. FREY
ATTORNEY GENERAL

*/s/ Emma Akrawi*
EMMA AKRAWI
Assistant Attorney General
Natural Resources Division
Office of the Maine Attorney General
6 State House Station
Augusta, Maine 04333
(207) 626-8800
Emma.Akrawi@maine.gov

**STATE OF MARYLAND**
ANTHONY G. BROWN
ATTORNEY GENERAL

*/s/ Steven J. Goldstein*
STEVEN J. GOLDSTEIN
Assistant Attorney General
Office of the Attorney General of
Maryland
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6414
sgoldstein@oag.maryland.gov

**STATE OF MICHIGAN**
DANA NESSEL
ATTORNEY GENERAL

*/s/ Neil Giovanatti*
NEIL GIOVANATTI
Assistant Attorney General
Michigan Department of Attorney
General
525 West Ottawa Street
Lansing, Michigan 48909
(517) 335-7622
GiovanattiN@michigan.gov

**STATE OF MINNESOTA**
KEITH ELLISON
ATTORNEY GENERAL

*/s/ Cat Rios-Keating*
CAT RIOS-KEATING
Special Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-7302
Catherine.Rios-Keating@ag.state.mn.us

**STATE OF NEVADA**
AARON D. FORD
ATTORNEY GENERAL

*/s/ K. Brunetti Ireland*
K. BRUNETTI IRELAND
Chief Deputy Attorney General, Special Litigation
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, Nevada 89119
(702) 486-8727
kireland@ag.nv.gov

**STATE OF NEW JERSEY**
JENNIFER DAVENPORT
ATTORNEY GENERAL

*/s/ Lisa J. Morelli*
LISA J. MORELLI
Deputy Attorney General
New Jersey Division of Law
25 Market Street
Trenton, New Jersey 08625
(609) 376-2740
Lisa.Morelli@law.njoag.gov

**STATE OF NEW YORK**
LETITIA JAMES
ATTORNEY GENERAL
JEFFREY W. LANG
Deputy Solicitor General
BRIAN LUSIGNAN
Assistant Solicitor General

*/s/ John Broderick*
JOHN BRODERICK
Assistant Attorney General
28 Liberty Street, 19th Floor
New York, New York 10005
(212) 416-8271
John.Broderick@ag.ny.gov

**CITY OF NEW YORK, NEW YORK**
STEVEN BANKS
CORPORATION COUNSEL

/s/ Alice R. Baker
ALICE R. BAKER
Senior Counsel
TESS DERNBACH
Senior Counsel
MEERA AIYER
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, New York 10007
(212) 356-2314
albaker@law.nyc.gov
tdernbac@law.nyc.gov

**STATE OF RHODE ISLAND**
PETER F. NERONHA
ATTORNEY GENERAL

/s/ Nicholas M. Vaz
NICHOLAS M. VAZ
Assistant Attorney General
Environment and Energy Unit Chief
Rhode Island Office of the Attorney General
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

**STATE OF OREGON**
DAN RAYFIELD
ATTORNEY GENERAL

/s/ Paul Garrahan
PAUL GARRAHAN
Sr. Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov

**STATE OF VERMONT**
CHARITY R. CLARK
ATTORNEY GENERAL

/s/ Melanie Kehne
MELANIE KEHNE
Assistant Attorney General
Office of the Vermont Attorney General
109 State Street
Montpelier, Vermont 05609-3201
(802) 828-3186
Melanie.Kehne@vermont.gov

**STATE OF WISCONSIN**
JOSH KAUL
ATTORNEY GENERAL

/s/ Bradley J. Motl
BRADLEY J. MOTL
Assistant Attorney General
Wisconsin Department of Justice
P.O. Box 7857
Madison, Wisconsin 53707-7875
(608) 267-0505
Bradley.Motl@wisdoj.gov

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a) and this Court's briefing order because this document contains 6,986 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).
2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Julia K. Forgie*
Julia K. Forgie

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 19, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit through this Court's CM/ECF system, which will serve a copy on all registered users.

*/s/ Julia K. Forgie*
Julia K. Forgie