**ORAL ARGUMENT NOT YET SCHEDULED**
**Nos. 26-1168 (Lead) & 26-1174, 26-1188, 26-1193 (Consolidated)**

# In the United States Court of Appeals for the District of Columbia Circuit

HEATING, AIR-CONDITIONING & REFRIGERATION DISTRIBUTORS INTERNATIONAL, *et al.*,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents*,

ALTA REFRIGERATION, INC., *et al.*,

*Intervenors*.

On Petitions for Review of a Final Action
of the United States Environmental Protection Agency,
91 Fed. Reg. 31,284 (May 26, 2026)

**INITIAL OPENING BRIEF FOR PETITIONERS HEATING, AIR-CONDITIONING & REFRIGERATION DISTRIBUTORS INTERNATIONAL; PLUMBING-HEATING-COOLING CONTRACTORS - NATIONAL ASSOCIATION; AIR CONDITIONING CONTRACTORS OF AMERICA; THE AIR-CONDITIONING, HEATING, AND REFRIGERATION INSTITUTE; AND THE ALLIANCE FOR RESPONSIBLE ATMOSPHERIC POLICY**

(*Counsel for Petitioners listed on inside cover*)

Misha Tseytlin
*Counsel of Record*
Kevin M. LeRoy
TROUTMAN PEPPER
LOCKE LLP
225 W. Randolph St.,
Suite 2600
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 759-1938 (KL)
(312) 443-0336 (fax)
misha.tseytlin@troutman.com
kevin.leroy@troutman.com

James W. Beers
TROUTMAN PEPPER
LOCKE LLP
401 9th St., NW, Suite 1000
Washington, D.C. 20004
(202) 274-1934
james.beers@troutman.com

Carson A. Cox
TROUTMAN PEPPER
LOCKE LLP
1001 Haxall Point, 15th Floor
Richmond, VA 23219
(804) 697-1338
carson.cox@troutman.com

*Counsel for Petitioners in Case No. 26-1174*

Jonathan S. Martel
Elisabeth S. Theodore
Samuel I. Ferenc
Charles R. Birkel
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone: (202) 942-5000

*Counsel for Petitioners in Case No. 26-1168*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Petitioners submit this statement pursuant to Local Rule 28(a)(1):

### A. Parties and Amici

Petitioners in Case No. 26-1168 are Heating, Air-Conditioning & Refrigeration Distributors International, Plumbing-Heating-Cooling Contractors–National Association, and Air Conditioning Contractors of America.

Petitioners in consolidated Case No. 26-1174 are the Air-Conditioning, Heating, and Refrigeration Institute and Alliance For Responsible Atmospheric Policy.

Petitioner in consolidated Case No. 26-1188 is Natural Resources Defense Council.

Petitioners in consolidated Case No. 26-1193 are Commonwealth of Massachusetts, State of California, State of Washington, State of Colorado, District of Columbia, State of Delaware, State of Hawaii, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New York, City of New York, State of Oregon, State of Rhode Island, State of Vermont, and State of Wisconsin.

Petitioners in consolidated Case No. 26-1202 are Alta Refrigeration, Inc. and Coalition for the Use of Safe and Efficient Refrigerants.

Respondents are the United States Environmental Protection Agency and Lee M. Zeldin, in his official capacity as Administrator of the Environmental Protection Agency.

Intervenors on behalf of respondents are Alta Refrigeration, Inc., American Frozen Food Institute, Coalition for the Use of Safe and Efficient Refrigerants, Food Marketplace, Inc., National Grocers Association, and Retail Litigation Center.

**B. Rulings Under Review**

The ruling under review is "Phasedown of Hydrofluorocarbons: Reconsideration of Certain Regulatory Requirements Promulgated Under the Technology Transitions Provisions of the American Innovation and Manufacturing Act of 2020," 91 Fed. Reg. 31,284 (May 26, 2026).

**C. Related Cases**

This case was not previously before this Court or any other court. *Food Marketplace, Inc. v. EPA*, No. 23-1347 (D.C. Cir.), involves a challenge in this Court to the rule preceding the action under review here, "Phasedown of Hydrofluorocarbons: Restrictions on the Use of Certain Hydrofluorocarbons Under the American Innovation and Manufacturing Act of 2020," 88 Fed. Reg. 73,098 (Oct. 24, 2023). That case has been held in abeyance pending further order of the Court.

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioners Heating, Air-Conditioning & Refrigeration Distributors International, Plumbing-Heating-Cooling Contractors—National Association, Air Conditioning Contractors of America Association, Inc., the Air-Conditioning, Heating, and Refrigeration Institute, and the Alliance For Responsible Atmospheric Policy respectfully submit the following Corporate Disclosure Statements:

Heating, Air-Conditioning & Refrigeration Distributors International states that it is a nonprofit, nonstock trade association that represents the interests of wholesaler-distributors of heating, ventilation, air-conditioning, and refrigeration equipment, parts, controls, and supplies across the United States and internationally. Heating, Air-Conditioning & Refrigeration Distributors International estimates that its approximately 570 U.S.-based wholesaler-distributor members distribute more than 75% of all heating, ventilation, air-conditioning, and refrigeration equipment, parts, controls, and supplies sold in the United States each year. Heating, Air-Conditioning & Refrigeration Distributors International has no parent company, and no publicly held company has a 10% or greater ownership interest in Heating, Air-Conditioning & Refrigeration Distributors International.

Plumbing-Heating-Cooling Contractors—National Association states that it is a nonprofit, nonstock trade association that represents the interests of plumbing

and heating, ventilation, and air conditioning contractors across the United States. Plumbing-Heating-Cooling Contractors—National Association estimates that its approximately 3,200 U.S.-based plumbing and heating, ventilation, and air-conditioning contractor members employ 64,000 plumbing and heating, ventilation, and air-conditioning professionals, many of whom sell, install, and service heating, ventilation, air-conditioning equipment, parts, controls, and supplies in the United States. Plumbing-Heating-Cooling Contractors—National Association has no parent company, and no publicly held company has a 10% or greater ownership interest in Plumbing-Heating-Cooling Contractors—National Association.

Air Conditioning Contractors of America Association, Inc. states that it is a nonprofit, nonstock trade association with over 3,000 member companies that represents the interests of roughly 60,000 heating, ventilation, air-conditioning, and refrigeration professionals across the United States. Air Conditioning Contractors of America members are responsible for designing, installing, and maintaining heating, ventilation, air-conditioning, and refrigeration systems that heat and cool homes, protect our food supply, facilitate modern medicine, and enable data centers to operate. In addition, they are responsible for fulfilling the essential comfort needs of nearly every hospital, office building, and home in the country. Air Conditioning Contractors of America is the premier trade association representing this pillar of the economy. Air Conditioning Contractors of America has no parent company, and no

publicly held company has a 10% or greater ownership interest in Air Conditioning Contractors of America.

The Air-Conditioning, Heating, and Refrigeration Institute states that it is a national trade association that represents manufacturers of equipment for heating, ventilation, air-conditioning, refrigeration, and water heating. The Air-Conditioning, Heating, and Refrigeration Institute's 330 member companies manufacture quality, efficient, and innovative residential and commercial equipment and components, and together account for more than 90% of the residential and commercial heating, ventilation, air-conditioning, and refrigeration equipment manufactured and sold in North America. Because the Air-Conditioning, Heating, and Refrigeration Institute is a non-profit, membership organization, it has no parent entity, and no publicly held company has a 10% or greater ownership interest in the Air-Conditioning, Heating, and Refrigeration Institute.

The Alliance For Responsible Atmospheric Policy states that it is a national trade association that represents businesses that produce hydrofluorocarbons, manufacturers that use hydrofluorocarbons, and businesses whose services rely on hydrofluorocarbons, as well as distributors, wholesalers, contractors, and refrigerant reclaimers. The Alliance For Responsible Atmospheric Policy has no parent entity, and no publicly held corporation has a 10% or greater ownership interest in the Alliance For Responsible Atmospheric Policy.

# TABLE OF CONTENTS


CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ i

CORPORATE DISCLOSURE STATEMENTS ............ iii

TABLE OF AUTHORITIES ............ viii

GLOSSARY ............ xi

STATEMENT WITH RESPECT TO ORAL ARGUMENT ............ xii

INTRODUCTION ............ 1

JURISDICTIONAL STATEMENT ............ 3

STATEMENT OF THE ISSUES ............ 3

STATUTES AND REGULATIONS ............ 4

STATEMENT OF THE CASE ............ 4

A. The AIM Act ............ 4

B. EPA's 2023 Technology-Transitions Rulemaking ............ 7

C. EPA's 2026 Rollback ............ 9

STANDARD OF REVIEW ............ 13

SUMMARY OF ARGUMENT ............ 13

STANDING ............ 16

ARGUMENT ............ 18

I. EPA Failed to Consider Significant Reliance Interests Engendered by its 2023 Technology-Transitions Rule ............ 18

II. The 2026 Rule Misreads the AIM Act, Unreasonably Disregards the Statutory Phasedown, and Reverses EPA's Position Without Explanation ............ 23

A. EPA Violated the AIM Act By Disregarding the Phasedown Schedule in Setting The Technology-Transitions Deadlines ............ 23

B. EPA Failed to Provide a Reasonable Rationale for Decoupling Supply and Demand Limits ............ 25

C. EPA Abruptly Reversed Its Policy of Aligning Demand Limits with the Phasedown Without Acknowledgment or Explanation ............ 27

III. EPA's Decision to Make the Delay Provisions Of The 2026 Rule Effective 60 Days After Promulgation—Rather Than One Year—Violates The AIM Act ....30

IV. EPA's Justifications For The 2026 Rule Run Contrary To The Record ....35

CONCLUSION ....39

CERTIFICATE OF COMPLIANCE ....40

CERTIFICATE OF SERVICE ....41

## TABLE OF AUTHORITIES*

**Page(s)**

**Cases**

*Am. Clinical Lab'y Ass'n v. Becerra*,
40 F.4th 616 (D.C. Cir. 2022) ........................................ 16, 17

**Cap. Power Corp. v. FERC*,
156 F.4th 644 (D.C. Cir. 2025) ........................................ 18, 22, 38

*Cboe Glob. Markets, Inc. v. SEC*,
155 F.4th 704 (D.C. Cir. 2025) ........................................ 30

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ........................................ 18

*Encino Motorcars v. Navarro*,
579 U.S. 211 (2016) ........................................ 28, 29

**FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........................................ 18, 22, 28

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ........................................ 35

*Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*,
71 F.4th 59 (D.C. Cir. 2023) ........................................ 5

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........................................ 13

*Maryland v. EPA*,
958 F.3d 1185 (D.C. Cir. 2020) ........................................ 13

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
70 F.4th 582 (D.C. Cir. 2023) ........................................ 17

*MediNatura, Inc. v. FDA*,
998 F.3d 931 (D.C. Cir. 2021) ........................................ 18, 21

* Authorities upon which we chiefly rely are marked with asterisks.

*Michigan v. EPA*,
576 U.S. 743 (2015) .......... 18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 25, 35

*NRDC v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020) .......... 4

*Pac. Gas & Elec. Co. v. FERC*,
113 F.4th 943 (D.C. Cir. 2024) .......... 25

*Sec'y of Lab., Mine Safety & Health Admin. v. KC Transp., Inc.*,
173 F.4th 294 (D.C. Cir. 2026) .......... 30, 34

*Sierra Club v. EPA*,
21 F.4th 815 (D.C. Cir. 2021) .......... 25

**Teva Pharms. USA, Inc. v. Kennedy*,
187 F.4th 587 (D.C. Cir. 2026) .......... 30, 31, 34

*U.S. Sugar Corp. v. EPA*,
113 F.4th 984 (D.C. Cir. 2024) .......... 13

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) .......... 25

*World Shipping Council v. Fed. Mar. Comm'n*,
152 F.4th 215 (D.C. Cir. 2025) .......... 16, 17

**Statutes**

American Innovation and Manufacturing Act of 2020,
Pub. L. No. 116-260, div. S, § 103, 134 Stat. 1182 (2020) .......... 5

5 U.S.C. § 553(d) .......... 7

42 U.S.C.
§ 7607(b)(1) .......... 3
§ 7607(d)(9) .......... 13
§ 7607(d)(9)(A) .......... 30
§ 7607(d)(9)(C) .......... 24
§ 7675(e)(2)(C) .......... 5, 23

42 U.S.C. (continued)
§ 7675(e)(3) .......... 5
§ 7675(i) .......... 6
*§ 7675(i)(1) .......... 7, 14, 15, 24, 25, 30, 31, 32, 33, 34
§ 7675(i)(4) .......... 6
§ 7675(i)(4)(B) .......... 24, 25
§ 7675(i)(4)(C) .......... 15, 37, 38
*§ 7675(i)(4)(D) .......... 8, 14, 23, 24, 25
*§ 7675(i)(6) .......... 7, 15, 30, 31, 32, 33, 34

**Regulations**

40 C.F.R. § 84.7 .......... 5

40 C.F.R. § 84.54(c)(9) .......... 8, 11

40 C.F.R. § 84.54(c)(11) .......... 8, 11

40 C.F.R. § 84.54(c)(12) .......... 8, 11

86 Fed. Reg. 55116 (Oct. 5, 2021) .......... 5, 6

*88 Fed. Reg. 73098 (Oct. 24, 2023) .......... 4, 5, 7, 8, 9, 19, 24, 28, 38

90 Fed. Reg. 47999 (Oct. 3, 2025) .......... 9

*91 Fed. Reg. 31,284 (May 26, 2026) .......... 2, 11-13, 21-24, 26, 27, 29, 32-38

**Legislative Materials**

168 Cong. Rec. S4897 (Sept. 21, 2022) .......... 5

*Promoting American Innovation and Jobs: Legislation to Phase Down Hydrofluorocarbons: Hearing on H.R. 5544 Before the Subcomm. on Env't & Climate Change of the H. Comm. on Energy & Com.* 116th Cong. (2020) .......... 7, 31, 32, 33

**Other Authorities**

*Graduated*, 6 Oxford English Dictionary 729 (J.A. Simpson & E.S.C. Weiner eds., 2d ed. 1989) .......... 31, 32

*Restrict*, 13 Oxford English Dictionary 758 (J.A. Simpson & E.S.C. Weiner eds., 2d ed. 1989) .......... 31, 32

## GLOSSARY

| | |
|---|---|
| 2023 Rule | Phasedown of Hydrofluorocarbons: Restrictions on the Use of Certain Hydrofluorocarbons Under the American Innovation and Manufacturing Act of 2020, 88 Fed. Reg. 73,098 (Oct. 24, 2023) |
| 2026 Rule | Phasedown of Hydrofluorocarbons: Reconsideration of Certain Regulatory Requirements Promulgated Under the Technology Transitions Provisions of the American Innovation and Manufacturing Act of 2020, 91 Fed. Reg. 31,284 (May 26, 2026) |
| AIM Act | American Innovation and Manufacturing Act of 2020, Pub. L. No. 116-260, div. S, § 103 (Dec. 27, 2020) |
| EPA | United States Environmental Protection Agency |
| HFC | Hydrofluorocarbon |

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

Petitioners respectfully submit that oral argument would assist the Court in resolving these petitions.

## INTRODUCTION

In 2020, Congress enacted the American Innovation and Manufacturing Act ("AIM Act") to progressively phase down the supply of hydrofluorocarbons ("HFCs")—synthetic chemicals used in refrigeration and air-conditioning equipment that significantly impact climate change. The Act aimed to support American innovator companies that are technological leaders in developing lower-impact substitute refrigerants and equipment. To avoid market disruptions during the supply phasedown, the AIM Act authorized EPA to promulgate regulations to reduce demand for HFCs by setting deadlines to transition to systems that use substitute refrigerants. When EPA promulgates these "technology-transition" regulations, the AIM Act requires it to consider the remaining HFC supply phasedown schedule and the regulations' overall economic impact, among other factors, and mandates that such regulations not take effect until one year after promulgation. Together, these requirements ensure that producers of refrigerants and manufacturers of equipment using them can smoothly transition to HFC substitutes with minimum market disruption.

In 2023, EPA followed Congress' directives and promulgated a technology-transitions rule. The 2023 rule set 2026 and 2027 deadlines for certain sectors of the heating, ventilation, air-conditioning, and refrigeration industry to transition to equipment that uses substitutes with lower "global-warming potential." EPA

designed the rule to reduce industry reliance on HFCs before the AIM Act's next (and large) supply stepdown in 2029. Petitioners' members—companies that produce HFCs and substitute refrigerants and manufacture, distribute, install, and service equipment that uses them—took EPA at its word. Relying on the 2023 rule, they invested millions of dollars developing compliant product lines, retooling factories, converting supply chains, and training technicians to come into compliance before the rule's impending deadlines. The market also began to shift in anticipation, with demand increasingly moving toward newly designed equipment using HFC alternatives.

But in 2026, EPA reversed course and promulgated a rule reconsidering the 2023 rule's transition requirements. 91 Fed. Reg. 31,284 (May 26, 2026) (the "2026 Rule"). For three key subsectors—remote condensing units, supermarket systems, and cold storage warehouses—the new rule postpones the 2023 rule's global-warming-potential limits until 2032, three years *after* the AIM Act's dramatic 2029 supply cut. The 2026 Rule also purported to take effect 60 days after its promulgation.

This Court should set aside these three delay provisions for multiple reasons. First, EPA failed to account for industry members' significant reliance interests in the prior rule. American companies, including Petitioners' members, invested heavily to transition to new technology to comply with the 2023 regime, and the

2026 Rule disrupted these reliance interests without adequate explanation. Second, EPA did not adequately consider the 2029 HFC supply cut and the remaining phasedown period, creating the precise misalignment between HFC supply and demand that Congress sought to avoid. Third, the new rule violates the AIM Act because EPA purported to make it effective 60 days after promulgation, even though the Act requires rules that restrict the use of regulated substances on a graduated schedule to be effective no sooner than one year after promulgation. Finally, EPA's justifications for the 2026 Rule run contrary to the evidence before the agency.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to review the 2026 Rule under 42 U.S.C. § 7607(b)(1). Petitioners timely petitioned for review within 60 days of the Rule's publication.

## STATEMENT OF THE ISSUES

1. Whether EPA failed to adequately address the significant reliance interests that its prior rule engendered among refrigerant producers and companies that manufacture, distribute, install, and maintain refrigeration systems.

2. Whether EPA's decision to untether limits on the use of certain refrigerants in remote condensing units, supermarkets, and cold storage warehouses from Congress' phasedown of their supply under the AIM Act violated the statutory text and lacked a reasonable explanation.

3. Whether EPA failed to sufficiently acknowledge and explain its changed approach to aligning refrigerant demand limits for remote condensing units, supermarkets, and cold storage warehouses with statutory supply restrictions.

4. Whether EPA acted unlawfully in setting the effective date for the 2026 Rule at 60 days after promulgation.

5. Whether EPA's justifications for the remote condensing unit, supermarket, and cold storage warehouse provisions in the 2026 Rule run contrary to the evidence before the agency.[2]

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the Addendum (ADD001-ADD027).

## STATEMENT OF THE CASE

### A. The AIM Act

HFCs are synthetic refrigerant chemicals used in refrigeration and air-conditioning equipment, among other applications, that are ultimately emitted into the atmosphere. *See* JA#, JA#[88.Fed.Reg.73098,73104]. HFCs replaced ozone-depleting refrigerants phased out under the Montreal Protocol, a 1987 treaty between the United States and other United Nations members. *See NRDC v. Wheeler*, 955

---

[2] Petitioners in No. 26-1168 do not join the aspects of the brief related to the effective date of the 2026 Rule. Petitioners in No. 26-1174 do not join the aspects of the brief as to cold storage warehouses.

F.3d 68, 99 (D.C. Cir. 2020). While HFCs do not deplete the ozone layer, most have a global-warming potential—a measure of climate impact—up to thousands of times that of carbon dioxide. *See* JA#, JA#[88.Fed.Reg.73098,73104].

In 2016, the Montreal Protocol signatories adopted the Kigali Amendment to the Protocol, committing to a global phasedown of HFC production and consumption in favor of lower-impact alternatives. The Senate ratified it in 2022. 168 Cong. Rec. S4897-98 (Sept. 21, 2022).

In 2020, Congress passed and President Trump signed the bipartisan AIM Act to phase down HFCs domestically by regulating both their supply and demand, while promoting U.S. leadership in the production of next-generation refrigerants and equipment. Pub. L. No. 116-260, div. S, § 103, 134 Stat. 1182, 2255 (2020). Modeled in part after Title VI of the Clean Air Act, which phased out ozone-depleting refrigerants, the Act directs a phasedown of HFC production and importation in steps: 90% of a pre-Act baseline in 2020, 60% in 2024, 30% in 2029, 20% in 2034, and 15% in 2036 and thereafter. 42 U.S.C. § 7675(e)(2)(C), (3); *see* 40 C.F.R. § 84.7. EPA promulgated a rule establishing an HFC "allowance" system in 2021. JA#[86.Fed.Reg.55116]; *see Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 62 (D.C. Cir. 2023). But experience with Title VI revealed the limits of a supply-side-only phasedown. Even as supply decreased, demand in some sectors dropped slowly because end-users could continue

purchasing new equipment using the regulated refrigerants, which would need refilling for years to come. That misalignment led to shortages and price spikes, in turn creating demand for black-market legacy refrigerants and significant illegal smuggling from foreign producers. *See* JA#[86.Fed.Reg.55166-68].

The AIM Act accordingly included complementary authority for EPA to reduce demand for HFCs through rules directing a sector-by-sector transition to substitute refrigerants. The demand-side provision of the Act, titled "Technology Transitions," provides that EPA "may by rule restrict, fully, partially, or on a graduated schedule, the use of a regulated substance in the sector or subsector in which the regulated substance is used." 42 U.S.C. § 7675(i).

EPA must consider four factors when adopting technology-transition rules:

> (A) the best available data;
>
> (B) the availability of substitutes . . . in a sector or subsector, taking into account technological achievability, commercial demands, affordability for residential and small business consumers, safety, consumer costs, building codes, appliance efficiency standards, contractor training costs, and other relevant factors, including the quantities of regulated substances available from reclaiming, prior production, or prior import;
>
> (C) overall economic costs and environmental impacts, as compared to historical trends; and
>
> (D) the remaining phase-down period for regulated substances under the final rule issued under subsection (e)(3), if applicable.

*Id.* § 7675(i)(4). Congress intended this approach to provide "an orderly and predictable transition to next-generation technologies" and avoid the price spikes

and smuggling from abroad that result when demand for regulated refrigerants exceeds lawful production and importation. *Promoting American Innovation and Jobs: Legislation to Phase Down Hydrofluorocarbons: Hearing on H.R. 5544 Before the Subcomm. on Env't & Climate Change of the H. Comm. on Energy & Com.*, 116th Cong. 2, 13 (2020) ("*Hearing on H.R. 5544*") (statements of Rep. Paul Tonko and Cynthia Newberg, Dir., Stratospheric Prot. Div., EPA).

The Act also requires EPA to delay effectiveness of final rules that "restrict" the use of regulated substances like HFCs, including "on a graduated schedule," until one year after promulgation. 42 U.S.C. § 7675(i)(1), (6). That is longer than the Administrative Procedure Act's 30-day default, 5 U.S.C. § 553(d), consistent with the Act's phasedown structure and purpose to provide regulatory certainty and predictable transition timelines.

**B. EPA's 2023 Technology-Transitions Rulemaking**

In response to over a dozen rulemaking petitions highlighting the need to shift high-volume HFC sectors to available, cost-effective substitutes as HFC supply declines, EPA issued a technology-transitions rule in 2023. JA#[88.Fed.Reg.73098] (the "2023 Rule"). The 2023 Rule explained that sector-specific restrictions on HFC use complement the AIM Act's supply limitations. JA#[88.Fed.Reg.73123]. EPA noted that, by reducing HFC demand, the technology-transitions provision mitigates price spikes that harm customers and disincentivizes black-market smuggling from

foreign producers that undercuts U.S. producers and manufacturers that have transitioned to substitutes and harms the environment. *See* JA#, JA#[88.Fed.Reg.73123,73160].

The 2023 Rule set sector-specific cutoffs for installing systems that use high-global-warming-potential HFCs, with effective dates between January 1, 2025, and January 1, 2028, ahead of the 2029 supply cut. JA#[88.Fed.Reg.73099]. The rule covered, among others, three subsectors that use large amounts of HFCs: EPA set deadlines for cold storage warehouse systems and remote condensing units in retail food systems effective January 1, 2026, and for supermarket systems effective January 1, 2027. JA#[88.Fed.Reg.73150]. The rule prohibited new equipment for those sectors using HFCs with global-warming potentials above 150 or 300, depending on system size. *See* 40 C.F.R. § 84.54(c)(9), (11), (12) (2025); JA#, JA#[88.Fed.Reg.73157-58,73162].

The 2023 Rule was consistent with "the remaining phase-down period," EPA explained, because it aligned with the supply reduction set to occur between 2023 and the sharp cut in 2029 from 60 to 30 percent of the baseline. JA#[88.Fed.Reg.73139-40] (citing 42 U.S.C. § 7675(i)(4)(D)). Demand-side limits in the years leading up to 2029 would "have a complementary effect in meeting the HFC phasedown schedule by facilitating necessary transitions to lower-[global-warming-potential] substitutes." JA#[88.Fed.Reg.73140]. EPA further noted that

the rule targeted "sectors and subsectors that are better positioned to transition to new substitutes and technologies," supporting "the overall production and consumption phasedown" by reserving HFC supply for sectors facing greater obstacles to transitioning. *Id.*

### C. EPA's 2026 Rollback

In 2025, EPA announced plans to roll back parts of the 2023 Rule by delaying effective dates for key subsectors, including postponing the 150/300-global-warming-potential limits for supermarkets, remote condensing units, and cold storage warehouses until January 1, 2032—three years after the 2029 halving of HFC supply. JA#[90.Fed.Reg.47999-48001]. Until 2032, EPA proposed to apply much higher interim limits of 1,400 for remote condensing units and supermarket systems and 700 for cold storage warehouses. JA#[90.Fed.Reg.48000-01].

The proposed rule received extensive negative comments. Substitute producers and equipment manufacturers explained that they had made significant capital commitments—including developing compliant systems, retooling chemical plants and equipment factories, converting supply chains, and hiring and training technicians—in reliance on EPA's prior rule imposing global-warming-potential limits in 2026 and 2027. JA#[EPA-HQ-OAR-2025-0005-0153,6; EPA-HQ-OAR-2025-0005-0129,2; EPA-HQ-OAR-2025-0005-0138,21-22]. Industry stakeholders also explained that they had built inventory and prepared their customer base for the

transition to new lower-global-warming-potential substitutes based on the regulatory certainty created by the statutory phasedown schedule and the 2023 Rule. *See* JA#[EPA-HQ-OAR-2025-0005-0153,6; EPA-HQ-OAR-2025-0005-0138,23].

Commenters noted that EPA's proposal would undermine the phasedown by increasing demand for legacy equipment using high-global-warming-potential refrigerants, resulting in significantly increased annual HFC consumption. JA#[EPA-HQ-OAR-2025-0005-0132,6]. Others warned that increasing demand and competition for high-global-warming-potential refrigerants would prompt price spikes, shortages, and smuggling when the 2029 supply cut occurs. JA#[EPA-HQ-OAR-2025-0005-0138,29-31; EPA-HQ-OAR-2025-0005-0134,5-6]. Moving transition timelines back and raising interim limits would benefit late-moving foreign competitors who had not undertaken comparable investments in reliance on the 2023 Rule, unlike many American innovator firms, and thus would be able to ship legacy models into the U.S. market under the proposal's delayed deadlines, undercutting domestic manufacturers' investments. *E.g.*, JA#[EPA-HQ-OAR-2025-0005-0153,5-6]. Commenters also observed that, if EPA did move forward with its partial relaxations of the 2023 Rule's restrictions, it could not apply its proposed 30-day effective date to such partial relaxations because the AIM Act requires a one-year delay. JA#[EPA-HQ-OAR-2025-0005-0153,30-31].

Environmental organizations and states also strongly opposed the changes, arguing they would increase HFC emissions that worsen climate change. They agreed with industry comments that substitutes are available and that the delay would cause demand to exhaust and even exceed supply, causing both greater climate harm to their members and citizens and raising grocery bills, home repair expenses, and other costs. JA#[EPA-HQ-OAR-2025-0005-0131,18-22; EPA-HQ-OAR-2025-0005-0164,4-9].

EPA rejected commenters' concerns and promulgated the final rule in May 2026, delaying the 150/300 global-warming-potential limits for supermarkets, remote condensing units, and cold storage warehouses until 2032. JA#[91.Fed.Reg.31284]; *see* 40 C.F.R. § 84.54(c)(11) (remote condensing units); *id.* § 84.54(c)(12) (supermarkets); *id.* § 84.54(c)(9) (warehouses) (together, the "Delay Provisions"). EPA acknowledged that "many [compliant] equipment options" are available in the impacted subsectors, JA#, JA#[91.Fed.Reg.31326,31312-13], but stated that the availability of substitutes was "just one factor," JA#[91.Fed.Reg.31306], that the Delay Provisions would allow "retailers more time to fully evaluate the available options," JA#[91.Fed.Reg.31326], that supermarkets "will benefit from the flexibility," JA#[91.Fed.Reg.31304], and that cold storage warehouses would face reduced "burden," JA#[91.Fed.Reg.31296]. EPA also referenced concerns about "building codes" that could affect adoption of equipment

using certain substitutes, although it acknowledged that it was unaware of any actual jurisdiction with a building code that prevented substitution. JA#, JA#[91.Fed.Reg.31309,31312].

EPA published an "Economic and Environmental Impacts" memorandum ("Memo") with the final rule. JA#[EPA-HQ-OAR-2025-0005-0520-01]. EPA disclaimed reliance on the Memo to justify the rule, JA#[91.Fed.Reg.31287], but cited it repeatedly in responding to comments, *e.g.*, JA#[91.Fed.Reg.31324-25]. The Memo purported to estimate end-user cost savings in the three affected subsectors, JA#[EPA-HQ-OAR-2025-0005-0520-01,6], but conceded that the rule would significantly increase demand for HFCs and cause HFC prices to increase by 12 to 24 percent in 2029. JA#, JA#[EPA-HQ-OAR-2025-0005-0520-01,15].

EPA also declined to quantify "[i]ndirect costs via HFC market impacts," i.e., impacts on consumers from higher HFC prices; "[c]osts to equipment manufacturers and suppliers related to incremental investments required"; or "[f]orgone benefits from potential increased emissions of HFCs," JA#, JA#[EPA-HQ-OAR-2025-0005-0520-01,3,6]. EPA recognized that "recouping investments may be difficult for American manufacturers" who invested in reliance on the 2023 Rule, JA#[91.Fed.Reg.31327], and admitted in the Memo that "it is apparent that the costs to prepare for transitions ha[ve] been significant," JA#[EPA-HQ-OAR-2025-0005-

0520-01,59], but expressed hope that industry would voluntarily transition anyway, JA#[91.Fed.Reg.31328].

## STANDARD OF REVIEW

"Under the Clean Air Act, this Court 'may reverse' the EPA's [2026] Rule if it is 'in excess of statutory jurisdiction, authority, or limitations,' or 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 997 (D.C. Cir. 2024) (quoting 42 U.S.C. § 7607(d)(9)); *see Maryland v. EPA*, 958 F.3d 1185, 1196 (D.C. Cir. 2020) ("[W]e apply the same standard of review under the Clean Air Act as we do under the Administrative Procedure Act."). When the Court reviews an agency's interpretation of a statute, it must exercise its independent judgment and give no deference to the agency. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391-92 (2024).

## SUMMARY OF ARGUMENT

**I.** The 2026 Rule is arbitrary and capricious because EPA failed to consider industry members' significant reliance interests in the 2023 Rule. The 2023 Rule set timelines for an array of subsectors to transition their equipment away from products using legacy HFCs to systems using new lower-global-warming-potential alternatives. In response, industry members invested tens of millions of dollars to comply with those timelines. The Delay Provisions of the 2026 Rule upset that significant reliance-backed investment by reversing those timelines. Now, these

firms—American companies investing in innovative technologies—must suffer reduced demand for substitute refrigerants and corresponding equipment, carry duplicative product lines, maintain dual inventories, and incur additional recertification costs to comply with both the 2026 Rule and the 2023 Rule. And their offshore competitors who did not invest early to comply with the 2023 Rule will enjoy a competitive advantage. EPA did not come close to justifying the Delay Provisions' disruption of these reliance interests.

**II.A.** The 2026 Rule's Delay Provisions violated the AIM Act by disregarding the Act's phasedown schedule in delaying the transition for remote condensing units, supermarkets, and cold storage warehouses until three years after the major supply cut in 2029. Congress directed EPA to consider "the remaining phase-down period"—*i.e.*, the HFC supply-side restrictions—when setting demand-side limits on HFCs. 42 U.S.C. § 7675(i)(1), (4)(D). The Rule ignores that requirement. EPA claimed that it need not consider the supply phasedown because it is "wholly separate" from the demand-side restrictions. But Congress explicitly instructed EPA to consider supply and demand together.

**B.** Even if Congress had not required EPA to consider HFC supply and demand together, EPA's failure to do so was arbitrary and capricious. EPA's untethering of supply and demand in the Delay Provisions threatens to create exactly the HFC market disruption that Congress sought to avoid.

**C.** The 2026 Rule is also arbitrary and capricious because it abruptly reversed EPA's policy of aligning demand limits with the phasedown in the 2023 Rule. While the 2023 Rule had set 2026 and 2027 technology-transition deadlines to support the statutory HFC phasedown, the 2026 Rule abandons that approach without any acknowledgment or explanation.

**III.** EPA violated the AIM Act by making the Delay Provisions effective 60 days after promulgation, rather than one year. The Act provides that no rule that "restrict[s], fully, partially, or on a graduated schedule, the use of a regulated substance," 42 U.S.C. § 7675(i)(1), "may take effect before" "1 year after" promulgation, *id.* § 7675(i)(6). This applies to rules that reduce prior restrictions on a regulated substance, as they still restrict use of a regulated substance—albeit only partially, or on a graduated schedule. This provision applies to the 2026 Rule because it restricts the use of HFCs.

**IV.** Finally, EPA's justifications for the Delay Provisions are contrary to the record. To support postponing compliance dates for the three sectors at issue, EPA offered only vague assertions about needing flexibility and unspecified concerns for the availability of substitutes. However, EPA acknowledged that substitutes are available, that the three subsectors were already transitioning, and that delaying compliance shifts costs to others. More broadly, EPA did not consider the purported benefits of the 2026 Rule against "overall economic costs," *id.* § 7675(i)(4)(C)—

including costs for U.S. industry that had invested in reliance on the 2023 Rule. Finally, the record shows that industry was able to meet the 2023 Rule's transition schedules, further undermining EPA's rationale for the 2026 Rule.

## STANDING

Petitioners have associational standing. *See World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215, 221 (D.C. Cir. 2025); *Am. Clinical Lab'y Ass'n v. Becerra*, 40 F.4th 616, 621-22 (D.C. Cir. 2022). Petitioners' members either produce or sell refrigerants or manufacture, sell, install, and service equipment using refrigerants regulated by the AIM Act. *See* ADD# (Ayers Decl. ¶ 5); ADD# (Roberts Decl. ¶¶ 6-8); ADD# (Quinonez Decl. ¶¶ 6-7); ADD# (Kalvedt Decl. ¶¶ 7-10); ADD# (Hoover Decl. ¶¶ 4-5); ADD# (Grennell Decl. ¶¶ 7-8); ADD# (Hurst Decl. ¶ 4); ADD# (Caprizo Decl. ¶ 5). Petitioners' members invested in reliance on global-warming-potential limits in the 2023 Rule. *See* ADD# (Ayers Decl. ¶¶ 8-11); ADD# (Roberts Decl. ¶¶ 10-13); ADD# (Quinonez Decl. ¶ 10); ADD# (Kalvedt Decl. ¶¶ 12-14); ADD# (Hurst Decl. ¶ 9); ADD# (Caprizo Decl. ¶ 10). EPA's decision in the 2026 Rule to delay the transition to low-global-warming-potential technologies financially injures Petitioners' members because it will destroy or diminish the value of their investments to support the transition, cause them to lose customers and sales of substitutes and substitute equipment to competitors supplying HFC equipment, increase prices for HFCs needed to supply and service equipment,

and/or reduce demand for such servicing due to higher prices. *See* ADD# (Ayers Decl. ¶ 12); ADD# (Roberts Decl. ¶¶ 14-17); ADD# (Quinonez Decl. ¶¶ 8-11); ADD# (Kalvedt Decl. ¶¶ 11-16); ADD# (Hoover Decl. ¶¶ 6-8); ADD# (Grennell Decl. ¶¶ 9-10); ADD# (Hurst Decl. ¶¶ 8-14); ADD# (Caprizo Decl. ¶¶ 9-14); *Am. Clinical Lab'y*, 40 F.4th at 622; *World Shipping Council*, 152 F.4th at 221.

EPA's decision to apply a 60-day effective date instead of observing the AIM Act's required one-year-delay provision also injures Petitioners' members, as it unnecessarily distorts the refrigerant market and impedes alignment with the Act's 2029 phasedown cap while not affording manufacturers, distributors, and contractors adequate time to adjust production, certification, and inventory management to the 2026 Rule's new thresholds. *See* ADD# (Hurst Decl. ¶¶ 8-14); ADD# (Caprizo Decl. ¶¶ 9-14); *Am. Clinical Lab'y*, 40 F.4th at 622; *World Shipping Council*, 152 F.4th at 221. Vacating the 2026 Rule and reinstating the prior deadlines would redress these injuries. *See* ADD# (Ayers Decl. ¶ 13); ADD# (Roberts Decl. ¶ 18); ADD# (Quinonez Decl. ¶ 12); ADD# (Kalvedt Decl. ¶ 17); ADD# (Hoover Decl. ¶ 9); ADD# (Grennell Decl. ¶ 11); *Am. Clinical Lab'y*, 40 F.4th at 622. Petitioners seek to protect interests that are germane to their purposes, and neither the claims asserted nor relief requested require participation from individual members. *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 593 (D.C. Cir. 2023).

## ARGUMENT

### I. EPA Failed to Consider Significant Reliance Interests Engendered by Its 2023 Technology-Transitions Rule

The 2026 Rule's Delay Provisions are unlawful because EPA failed to adequately consider reliance interests. Agencies changing policies to the disadvantage of some regulated parties must first "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *MediNatura, Inc. v. FDA*, 998 F.3d 931, 940-41 (D.C. Cir. 2021) (quoting *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020)). "If an agency changes its policy despite reliance interests, it must provide a 'reasoned explanation' therefor." *Id.* at 941 (quoting *Regents*, 591 U.S. at 35). And if the agency's change in course jeopardizes serious reliance interests, then the agency must provide a "more detailed justification." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In particular, the agency must address costs, including whether a new policy will cause regulated parties "material financial harm in the short term," and "adequately explain why these reliance interests were either inconsequential or outweighed by countervailing considerations." *Cap. Power Corp. v. FERC*, 156 F.4th 644, 651-52 (D.C. Cir. 2025); *accord Michigan v. EPA*, 576 U.S. 743, 752-53 (2015).

EPA violated those requirements in the 2026 Rule, disregarding the havoc the rollback wreaks on the producers, manufacturers, distributors, and contractors that

reoriented their businesses around the 2023 Rule's deadlines. The 2023 Rule set timelines for technology transitions for an array of subsectors in order to "support[] innovation" and "provid[e] regulatory certainty," while allowing "time for distributors and retailers to transition their inventory from products using regulated substances that do not meet the restrictions." JA#, JA#[88.Fed.Reg.73123, 73140]. Consistent with EPA's goals, producers, manufacturers, and distributors invested in research, development, production, materials, hiring, and training for compliant systems to meet the rule's deadlines, including the January 1, 2026 and 2027 deadlines for the retail food refrigeration, supermarket, and cold storage warehouse subsectors. *See, e.g.*, JA#[EPA-HQ-OAR-2025-0005-0153,4-7]; *supra* pp. 9-10.

Refrigerant producers invested tens of millions in retooling their chemical plants to produce low-global-warming-potential substitutes to adhere to the impending deadlines. *See* JA#[EPA-HQ-OAR-2025-0005-0132,4]. Equipment manufacturers invested at similar scale to develop compliant low-global-warming-potential products, retool factories, convert supply chains, and hire and train technicians—all to serve the market consistent with 150/300-global-warming-potential limits. *See* JA#[EPA-HQ-OAR-2025-0005-0129,4]; JA#[EPA-HQ-OAR-2025-0005-0112,5]; JA#, #, #, #[EPA-HQ-OAR-2025-0005-0153,6-7,12,14,21-22].

The 2026 Rule upset these reliance-backed investments. By reversing its approach in mid-2026, EPA penalized those who made substantial investments in

substitute refrigerants and equipment to comply with the 2023 Rule. For example, without a regulatory incentive to adapt to next-generation technologies for another six years, manufacturers of substitutes and equipment have been left with idle inventory, such as parts and components for production and repair that they stocked in anticipation of low-global-warming-potential equipment accounting for a large share of the market in 2026 and beyond. JA#, #[EPA-HQ-OAR-2025-0005-0129,2-4,9]; JA#[EPA-HQ-OAR-2025-0005-0112,5]; JA#[EPA-HQ-OAR-2025-0005-0015,1-3]; JA#, #[EPA-HQ-OAR-2025-0005-0153,6,21]. And these same manufacturers are obligated to invest millions more to retool backward to make the legacy equipment that will now be in high demand. JA#[EPA-HQ-OAR-2025-0005-0129,4]. Indeed, the mere publication of the proposed rule led sales of compliant, low-global-warming-potential products to "drop[] to approximately 50%." JA#[EPA-HQ-OAR-2025-0005-0129,5].

Companies that have already invested substantial sums to come into compliance with the 2023 Rule—the U.S. innovators the AIM Act sought to support—suffer the most from the 2026 Rule's reversal. To prepare for the 2023 Rule, companies invested significantly in new refrigerant technology, compliance, workforce development, and product certification. JA#[EPA-HQ-OAR-2025-0005-0153,4-5]. These firms have already retooled, certified, and stocked compliant products to meet the 2023 Rule's technology-transition schedule. JA#[EPA-HQ-

OAR-2025-0005-0153,5]. Now, given the 2026 Rule's delaying of the transition dates, these firms must forgo demand for new technology substitutes, carry duplicative product lines, maintain dual inventories, and incur additional recertification costs to comply with both the 2026 Rule and the 2023 Rule to even hope to compete with producers of legacy refrigerants and equipment. JA#, #[EPA-HQ-OAR-2025-0005-0153,5,21]. These innovator firms are disproportionately American, and offshore firms that did not invest in resources to comply with the 2023 Rule's deadlines will enjoy a windfall vis-à-vis their American competitors from the 2026 Rule's delay. JA#[EPA-HQ-OAR-2025-0005-0153,3-4].

EPA paid only lip service to these expansive reliance interests when adopting the 2026 Rule. *Contra MediNatura*, 998 F.3d at 940-41. EPA perfunctorily noted the risk of sunk investments, stranded inventory, and lost profitability, *see* JA#[91.Fed.Reg.31326-28], and acknowledged that companies like Petitioners' members had made "significant investments," including the "launch of complete product lines that meet the 150 or 300 limits," JA#[91.Fed.Reg.31327]. EPA then blithely stated that "recouping investments may be difficult." JA#[91.Fed.Reg. 31327]. Nowhere did EPA "determine whether [these harms] were significant"—much less make a finding that they were not—nor did EPA "weigh . . . such interests against competing policy concerns." *MediNatura*, 998 F.3d at 940-41. And while EPA stated in response to comments discussing reliance interests that it had

"addresse[d] reliance issues in section II.A of th[e] preamble," JA#[91.Fed.Reg.31328], Section II.A does not "address" reliance interests at all: it simply states without any explanation that EPA "has considered the reliance interests" and "has determined that the requirements should be amended as detailed in this rulemaking," JA#[91.Fed.Reg.31288].

EPA's dismissive treatment of these substantial reliance interests is unlawful. *See Cap. Power Corp.*, 156 F.4th at 652. EPA was required to determine whether the 2026 Rule would cause regulated parties "material financial harm in the short term" and "adequately explain why these reliance interests were either inconsequential or outweighed by countervailing considerations." *Id.* at 651-52. EPA did not do that. Instead, it expressed a hope that some end-users would transition voluntarily "prior to 2032," JA#[91.Fed.Reg.31326], "thus *potentially* limiting the impact of reliance interests," JA#[91.Fed.Reg.31326-27] (emphasis added). But EPA acknowledged that the vast majority would not. JA#[EPA-HQ-OAR-2025-0005-0520-01,32_tbl.1-4]. That is not the "more detailed justification" required when serious reliance interests are at stake. *Fox*, 556 U.S. at 515. The point of the Rule was to allow end-users *not* to transition. Even if some do transition voluntarily, Petitioners' members would still be out tens of millions of dollars of investments in reliance on the 2023 Rule.

## II. The 2026 Rule Misreads the AIM Act, Unreasonably Disregards the Statutory Phasedown, and Reverses EPA's Position Without Explanation

The three Delay Provisions in the 2026 Rule are independently unlawful because EPA decoupled HFC demand limits from the statutory phasedown of HFC supply, declaring that the demand and supply provisions are "wholly separate." JA#, #[91.Fed.Reg.31305,31312-13]. That decision requires vacatur of the rule for three separate reasons. First, these provisions of the 2026 Rule are contrary to the statutory text. Congress directed EPA to consider the HFC supply phasedown schedule when promulgating technology-transition regulations. Second, EPA failed to consider an important aspect of the problem by embracing an approach that misaligns supply and demand. And third, EPA had recognized in the 2023 Rule that the AIM Act intends to align supply- and demand-side controls, but offered no acknowledgment or explanation for its abrupt reversal in position in the 2026 Rule.

### A. EPA Violated the AIM Act By Disregarding the Phasedown Schedule in Setting the Technology-Transitions Deadlines

When EPA sets demand-side limits on HFCs, it must consider "the remaining phase-down period"—*i.e.*, the supply-side restrictions Congress imposed under subsection (e). *See* 42 U.S.C. § 7675(i)(4)(D). Here, Congress directed a 50 percent stepdown in 2029. *Id.* § 7675(e)(2)(C). Congress' requirement to consider the remaining phasedown makes sense because the goal of the technology-transitions provision is to avoid the price spikes and shortages that result from constraining

supply by transitioning to substitute refrigerants and equipment. In the 2023 Rule, EPA correctly identified the substantial 2029 supply cut as an "important factor" in setting restrictions on HFC use and, accordingly, imposed restrictions for "sectors and subsectors that are better positioned to transition to new substitutes and technologies" before that stepdown. JA#[88.Fed.Reg.73140]. That move "support[ed] the overall production and consumption phasedown" by safeguarding dwindling supply for sectors facing more significant difficulties in transitioning. *Id.*

Unlike the 2023 Rule, the 2026 Rule ignores the requirement to consider the statutory "phase-down period," 42 U.S.C. § 7675(i)(4)(D), which alone renders the 2026 Rule unlawful. *See* 42 U.S.C. § 7607(d)(9)(C). The 2026 Rule's Delay Provisions postpone meaningful global-warming-potential limits for three key subsectors until 2032—three years *after* the 60-percent-to-30-percent statutory supply stepdown—creating the supply-demand mismatch Congress sought to prevent.

Instead, EPA simply claimed that the AIM Act supply phasedown schedule is "wholly separate" from the technology-transition provision's demand restrictions, JA#, #[91.Fed.Reg.31305,31312-13], because "[t]hese are two distinct subsections," JA#, #[91.Fed.Reg.31304,31317]. But Congress explicitly instructed EPA to consider the available supply and "the remaining phase-down period for regulated substances" when acting to "restrict . . . the use of a regulated substance in [a] sector

or subsector." 42 U.S.C. § 7675(i)(1), (4)(B), (4)(D). Statutory subsections may impose "distinct" requirements, but that does not make them "wholly separate," and certainly not when Congress expressly directs otherwise. "An agency has no power to tailor legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Pac. Gas & Elec. Co. v. FERC*, 113 F.4th 943, 950 (D.C. Cir. 2024) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014)). And "EPA may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion." *Sierra Club v. EPA*, 21 F.4th 815, 825 (D.C. Cir. 2021) (citation omitted). That is what EPA did here in declaring that it need not consider the supply phasedown in setting demand restrictions. The agency's decoupling of two sections that Congress ordered it to consider together is irreconcilable with the plain text.

### B. EPA Failed to Provide a Reasonable Rationale for Decoupling Supply and Demand Limits

Even if Congress had not mandated that EPA consider the supply phasedown in promulgating technology-transitions rules, EPA's failure to do so here unlawfully ignored "an important aspect of the problem." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

EPA's untethering of its technology-transitions rulemaking from the phasedown schedule means the 2026 Rule misaligns supply and demand of HFCs and threatens precisely the disruptive market consequences that the AIM Act sought

to avoid—including diminished demand for substitute refrigerants and equipment, along with price shocks and black-market smuggling that harms domestic manufacturers and suppliers. JA#[EPA-HQ-OAR-2025-0005-0138,30-34]; JA#[EPA-HQ-OAR-2025-0005-0134,7]; JA#[EPA-HQ-OAR-2025-0005-0153,7-12]. EPA's own predictions reflect that an increase in demand coupled with a decline in supply is likely to harm consumers in myriad ways, including by forcing "transitions in subsectors not covered" and by requiring consumers to "forgo[] or delay[] the repair and recharging of existing HFC systems." JA#[91.Fed.Reg.31324].

EPA observed that the "phasedown itself is expected to be a market driver for the transition" to new technologies, JA#, #[91.Fed.Reg.31313,31317], speculating that the "availability of substitutes" and the impact of the "remaining phasedown schedule . . . *could* result" in users voluntarily transitioning to technologies below 150/300-global-warming-potential limits "prior to January 1, 2032." JA#[91.Fed.Reg.31312] (emphasis added). To be sure, greater costs will force some market actors to change equipment, especially after the 2029 supply cut. But if Congress believed that constrained supply and resulting market pressures alone could drive an orderly transition, it would not have authorized demand controls and required EPA to consider the phasedown in designing them. Indeed, under EPA's

logic, there would be no reason to retain the global-warming-potential limits at all, even in 2032.

Moreover, EPA's own projections (and commenters', *see, e.g.*, JA#[EPA-HQ-OAR-2025-0005-0132,14-15]) showed that voluntary transition would not outpace the supply restrictions. In 2023, EPA projected that its restrictions would keep demand below the supply cap through 2036, promoting demand for innovative substitutes and reducing HFC emissions. JA#[EPA-HQ-OAR-2025-0005-0519-52,35]. By 2026, EPA's updated modeling projected that demand would reach or exceed the cap around 2029, even with the 2023 Rule's restrictions in place. JA#[91.Fed.Reg.31324]; JA#[EPA-HQ-OAR-2025-0005-0520-01,14_fig.ES-1]. EPA's internal analysis showed that the 2026 Rule's rollback would seriously exacerbate the problem—increasing demand by up to 8.9 percent through 2031, adding decades of "locked in" servicing demand based on new HFC installations between 2027 and 2031, and raising HFC prices in 2029 by 12 to 24 percent. JA#, #, #[EPA-HQ-OAR-2025-0005-0520-01,12-13,62_tbl.4-1]. EPA arbitrarily ignored those issues when it decided to promulgate the Delay Provisions and allow demand to exceed supply.

### C. EPA Abruptly Reversed Its Policy of Aligning Demand Limits with the Phasedown Without Acknowledgment or Explanation

The 2026 Rule was a stark reversal of EPA's 2023 decision to align supply- and demand-side controls in the market for HFCs and equipment using them. EPA

independently violated the Administrative Procedure Act by failing to explain why it was abandoning its prior position that HFC demand limits should complement the supply phasedown schedule. *Fox*, 556 U.S. at 514-16; *Encino Motorcars v. Navarro*, 579 U.S. 211, 221-22 (2016).

The 2023 Rule had set 2026 and 2027 deadlines for adopting low-global-warming-potential technologies to "support[] the overall production and consumption phasedown" that Congress mandated. JA#[88.Fed.Reg.73140]. EPA acknowledged that the subsection (e) phasedown and the subsection (i) demand restrictions are linked and "complementary," explaining that the "reduction in the supply of HFCs is an important factor in finalizing [demand-side] restrictions under subsection (i)." *Id.* EPA also explicitly rejected any suggestion that the supply phasedown "negates the need to promulgate regulations under subsection (i)," JA#[88.Fed.Reg.73159], explaining that a phasedown standing alone would create HFC scarcity and "price increases in the event that demand also remains high." JA#[88.Fed.Reg.73159]. The 2023 Rule implemented the technology-transitions provision to mitigate those impacts by reducing demand to match constraints on supply.

The 2026 Rule abandoned that approach without acknowledgment or explanation. Although EPA asserted, *ipse dixit*, that the phasedown and demand restriction provisions were "separate," it never acknowledged that the prior rule had

taken the opposite approach, much less explained the change. JA#[91.Fed.Reg.31305]. That breached EPA's duties to "at least display awareness" when "it is changing position and show that there are good reasons for the new policy." *Encino Motorcars*, 579 U.S. at 221 (citation modified). EPA did neither. EPA did not point to any new factual developments that could justify a decision to ignore the looming 2029 stepdown in setting demand-side restrictions. While the 2026 Rule includes an update to the technical analysis that supported the 2023 Rule, *see* JA#[EPA-HQ-OAR-2025-0005-0520-02,112], the update only reinforced the need to align supply and demand through the technology-transitions rule. The new analysis projected that HFC demand would "exceed cap levels around the 2029 statutory stepdown" even under the 2023 Rule—heightening the risk of price spikes and shortages, which might have supported a *more* stringent demand restriction than the one EPA imposed in 2023, not a less stringent one. JA#[91.Fed.Reg.31324]. EPA's revised analysis—that supply restrictions even coupled with a demand restriction would not keep demand from exceeding supply in 2029—did not support EPA's decision to *uncouple* supply restrictions from demand.

EPA's new conclusion that a technology transition is unnecessary to support the phasedown on Congress' timeline is contrary to EPA's 2023 position. This "[u]nexplained inconsistency" in agency policy is itself reason for concluding that the Rule is "arbitrary and capricious." *Encino Motorcars*, 579 U.S. at 222 (citation

omitted); *see also Cboe Glob. Markets, Inc. v. SEC*, 155 F.4th 704, 716 (D.C. Cir. 2025).

## III. EPA's Decision to Make the Delay Provisions of the 2026 Rule Effective 60 Days After Promulgation—Rather Than One Year—Violates the AIM Act

The 2026 Rule is also "not in accordance with law," 42 U.S.C. § 7607(d)(9)(A), because it contravenes the AIM Act's requirement that such rules not take effect until one year after promulgation.

Section 7675(i)(6) provides that no technology-transitions rule that "restrict[s], fully, partially, or on a graduated schedule, the use of a regulated substance," 42 U.S.C. § 7675(i)(1), "may take effect before the date that is 1 year after the date on which the Administrator promulgates the [] rule," *id.* § 7675(i)(6). Interpreting this statute according to its "ordinary" and plain "text," *Sec'y of Lab., Mine Safety & Health Admin. v. KC Transp., Inc.*, 173 F.4th 294, 311 (D.C. Cir. 2026) (citations omitted), and giving "effect" "to every clause and word," *Teva Pharms. USA, Inc. v. Kennedy*, 187 F.4th 587, 603 (D.C. Cir. 2026) (citation omitted), Section 7675(i)(6) must apply *both* to agency actions that impose a new restriction on the use of a regulated substance *and* to agency action that reduces—but does not eliminate—a prior restriction on the use of regulated substance.

The key terms here are "restrict" and "graduated," which indicate that Section 7675(i)(6)'s scope includes rules that reduce without eliminating a prior restriction

on a regulated substance. To "restrict" is "[t]o limit (a person or thing); to confine to or within certain limits." *Restrict*, 13 Oxford English Dictionary 758 (J.A. Simpson & E.S.C. Weiner, eds., 2d ed. 1989). "Graduated," in turn, means to be "[f]ormed by or consisting of steps." *Graduated*, 6 Oxford English Dictionary 729. A rule that relaxes a previous restriction on the use of regulated substance without removing that restriction still "restrict[s]" the "use of a regulated substance"—albeit only "partially, or on a graduated schedule." *See* 42 U.S.C. § 7675(i)(1), (6). That is, a rule that lowers use-restrictions on a given substance still "confine[s]" the uses of that substance "within certain limits." *Restrict*, 13 Oxford English Dictionary 758. And a rule that decreases or increases use-restrictions on regulated substances over time is a rule that is "[f]ormed by or consisting of" use-restriction "steps." *Graduated*, 6 Oxford English Dictionary 729. In all, given the ordinary meaning of "restrict" and "graduated," Section 7675(i)(6) must apply to *any* regulation that restricts the use of a regulated substance, regardless of whether such a regulation increases or decreases the stringency of a prior restriction.

The one-year provision's plain text aligns with its purpose and the AIM Act's "overall statutory scheme." *Teva Pharms.*, 187 F.4th at 603 (citation omitted). Relaxing a prior usage restriction can still impose burdens on manufacturers, including by requiring them to "maintain multiple product lines" and more "complex[]" "supply chains, warehousing, [and] distribution networks." *Hearing*

*on H.R. 5544* at 39-40. Thus, a one-year effective date on a rule relaxing—but not eliminating—a use restriction benefits manufacturers, who still need sufficient time to adjust their operations to meet the new limit. *Supra* pp. 9-10. By contrast, a rule that completely *removes* a use-restriction on a regulated substance would not fall within Section 7675(i)(6)'s scope because such action does not "restrict" the use of a regulated substance. 42 U.S.C. § 7675(i)(1), (6).

Applying these principles here, the 2026 Rule violates Section 7675(i)(6). EPA promulgated the 2026 Rule on May 26, 2026, and stated that it "is effective on July 27, 2026." JA#[91.Fed.Reg.31284]. Thus, EPA has purported to make the 2026 Rule effective 60 days from the date of promulgation, rather than one year from the date of promulgation—*i.e.*, May 26, 2027. *Contra* 42 U.S.C. § 7675(i)(6). The 2026 Rule falls squarely within the scope of Section 7675(i)(6) because it "restrict[s]" the use of HFCs, a regulated substance. *See id.* § 7675(i)(1), (6). The 2026 Rule relaxes existing restrictions on the use of HFCs by delaying certain compliance dates and raising interim global-warming-potential limits on a sector-wide basis. *Supra* pp. 11-12. So, while that action lessens use-restrictions vis-à-vis the 2023 Rule, the 2026 Rule still "confine[s]" those substances' usage "within certain limits," *Restrict*, Oxford English Dictionary, *supra*, and thus "restrict[s] . . . the use of" those substances, 42 U.S.C. § 7675(i)(1). In particular, the 2026 Rule still restricts the use of HFCs by prohibiting the use of HFC refrigerants with a

global-warming potential of over 700 for cold storage warehouses or over 1,400 for supermarkets and retail food remote condensing units until 2032, after which point the prior 150 and 300 global-warming-potential limits will apply again. *See* JA#, #[91.Fed.Reg.31286,31330]. The 2026 Rule falls within the scope of the AIM Act's one-year-delay provision and so may not "take effect" until "1 year after the date on which the Administrator promulgates the [] rule." 42 U.S.C. § 7675(i)(6). The use of HFCs continues to be "limit[ed]" and never stops being "restrict[ed]" under the 2026 Rule. *Id.* § 7675(i)(1). The 2026 Rule thus may not "take effect" until "1 year after the date on which the Administrator promulgates the [] rule." *Id.* § 7675(i)(6); *contra* JA#[91.Fed.Reg.31284].

The consequences of EPA's unlawful effective date are substantial. As discussed above, the AIM Act phases down production and consumption of HFCs by constraining the aggregate supply and setting a consumption cap that gradually declines from 2020 to 2036. *See* JA#[EPA-HQ-OAR-2025-0005-0153,7-8]. This promotes "certainty for manufacturers and consumers and an orderly and predictable transition to next-generation technologies" that are "more environmentally friendly." *Hearing on H.R. 5544* at 2; *see also id.* at 7-8, 39-40, 44-46, 48, 60-61. Predictable timelines for these transitions are essential for manufacturers, as they require significant investments to retool factories, certify new products, train technicians, and sequence commercialization. JA#, #[EPA-HQ-OAR-2025-0005-

0153,2,5-6]. They are also crucial for American consumers because reliable heating and cooling equipment is critical infrastructure for overall economic success. JA#[EPA-HQ-OAR-2025-0005-0153,5-6]. The AIM Act's one-year-delay provision ensures that manufacturers and the public have this needed regulatory certainty and predictability to successfully execute these transitions.

The 2026 Rule's efforts to evade Section 7675(i)(6)'s one-year-delay provision fail. According to EPA, that provision applies only to rules that "create[] new restrictions for a particular sector or subsector" that EPA is regulating for the first time or that impose more "stringent" restrictions on an already-regulated substance. JA#[91.Fed.Reg.31301]. Rules that modify a regulated substance's existing restrictions by making them "less stringent," EPA claims, do not fall within those categories. JA#[91.Fed.Reg.31301].

EPA's preferred interpretation is not the "best reading" of the AIM Act's "text," *KC Transp., Inc.*, 173 F.4th at 316. Again, the one-year-delay provision applies to rules that "restrict" the use of regulated substances, 42 U.S.C. § 7675(i)(1), without qualification, *supra* pp. 6-7. It does not, for example, say that it applies only to rules that "restrict more" or "restrict less." Moreover, the AIM Act specifically provides that the one-year-delay provision applies to rules that "restrict" a "regulated substance" only "partially, or on a graduated schedule," 42 U.S.C. § 7675(i)(1)—words that EPA reads out of the statute, *contra Teva Pharms.*, 187 F.4th at 603.

## IV. EPA's Justifications for the 2026 Rule Run Contrary to the Record

The 2026 Rule's justifications are unreasonable, contrary to the record, and unsupported by substantial evidence. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *State Farm*, 463 U.S. at 43.

EPA justified postponing compliance dates based on vague assertions about needing "flexibility," hazy concerns about costs, or "changes in our understanding of the availability of substitutes." JA#, #[91.Fed.Reg.31294-96,31306]. But EPA acknowledged that substitutes are readily available, that users in the three affected subsectors are already able to transition, and that delaying compliance for those subsectors would shift costs to *other* subsectors and downstream consumers. *See infra* p. 38. With no other credible justifications offered, EPA's action is not "reasonable [or] reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423.

For supermarkets, EPA claimed the delay from 2027 to 2032 was needed due to its supposedly new "understanding of the availability of substitutes and the overall economic costs and environmental impacts" of the 2023 Rule, noting the "complexity" of supermarket systems and "*potential* challenges with building code adoption." JA#[91.Fed.Reg.31294] (emphasis added). But EPA conceded that substitutes "are currently available" and acknowledged that supermarkets nationwide were adopting them. JA#[91.Fed.Reg.31307]. EPA also failed to identify any "building code" that prevented substitution. JA#,

#[91.Fed.Reg.31307,31309-10]. And EPA cannot simply recite that relaxing restrictions would provide additional "flexibility," JA#[91.Fed.Reg.31306-07]—something that is true of every deregulatory action.

EPA's reasoning on remote condensing units and cold storage warehouses is similarly deficient. EPA acknowledged the availability of HFC alternatives and stated that "a graduated schedule is more appropriate for remote condensing units for reasons other than availability of alternatives," JA#[91.Fed.Reg.31314], namely: "[r]etailers may need additional time to become familiar with these technologies"; "technicians may need additional training"; and building-code-safety provisions "may" be a "near-term barrier," JA#[91.Fed.Reg.31314]. This speculation untethered to record evidence cannot support agency action—especially since the "majority" of remote condensing units do not pose code-relevant safety concerns, "further limiting challenges for installation based on building codes." JA#[91.Fed.Reg.31315].

For cold storage warehouses, EPA conceded that the subsector has "historically and widely used ammonia, a refrigerant that is not impacted by the HFC phasedown," and cited evidence that over 90% of the subsector already uses "either ammonia or [carbon dioxide]." JA#[91.Fed.Reg.31316]. EPA nonetheless defended raising the interim global-warming-potential limit to 700 in order to

"provide additional options," JA#[91.Fed.Reg.31316]—another rationale that could justify every deregulatory action.

EPA's remaining justifications are likewise unsupported. EPA asserted that "more time is needed" for refrigerant suppliers to produce HFC substitutes "in sufficient quantities" and for manufacturers "to further develop, design, and distribute technologies" using them. JA#[91.Fed.Reg.31304-05]. But EPA never supported that claim with evidence, and the record contradicts it: suppliers, manufacturers, and distributors invested millions in anticipation of the 150/300-global-warming-potential limits, and now the supply of substitutes and compatible equipment will exceed demand. *See supra* pp. 9-10. On this record, it is irrational for EPA to allow further installations of high-global-warming-potential equipment until 2032, three years after HFC supply will be cut in half. *Supra* pp. 9-10.

More broadly, EPA did not consider the purported benefits of the 2026 Rule in light of "*overall* economic costs," as the AIM Act requires. 42 U.S.C. § 7675(i)(4)(C) (emphasis added). EPA stated that relaxation would save up to $976 million in engineering costs in affected subsectors. JA#[91.Fed.Reg.31328]. While that figure was drawn from an impacts assessment memo that EPA said it was *not* relying upon, JA#[91.Fed.Reg.31287], *see* JA#[EPA-HQ-OAR-2025-0005-0520-01,6_tbl.ES2]—and so cannot support EPA's action—EPA failed in any event to compare the expected cost savings for the preferred subsectors to the expected cost

increases for *other* subsectors, *see* JA#, #[91.Fed.Reg.31287,31324]. For example, the 2023 Rule declined to prohibit HFCs in heavy-duty vehicles like ambulances and motorhomes because there were *no* available substitutes. JA#, #[88.Fed.Reg.73171-72,73183]. The 2026 Rule means those subsectors will lose out on HFC supply and flexibility—due to shortages and price spikes—although they need it the most. EPA also failed to consider and weigh the additional costs to comply with the 2026 Rule borne by industry members who relied on the 2023 Rule. *Cap. Power Corp.*, 156 F.4th at 652; *accord* 42 U.S.C. § 7675(i)(4)(C). And those costs are significant—including the need to carry duplicative product lines, maintain dual inventories, and incur additional recertification costs to meet the requirements of both the 2026 Rule and the 2023 Rule. *Supra* pp. 20-21.

Finally, the record shows that the industry was fully able to meet the transition schedules under the 2023 Rule, further undermining the record justification for the 2026 Rule's significant costs. EPA's June 2024 "Significant New Alternatives Policy (SNAP) rulemakings" confirmed that technically feasible substitutes were already available for new supermarket systems and retail food remote condensing units. JA#[EPA-HQ-OAR-2025-0005-0153,15]. Given that record, there are no "countervailing considerations" to "outweigh[]" the 2026 Rule's costs. *Cap. Power Corp.*, 156 F.4th at 651.

## CONCLUSION

The Court should vacate the challenged portions of the 2026 Rule.

Dated: October 19, 2026

Respectfully submitted,

*<u>/s/ Misha Tseytlin</u>*
Misha Tseytlin
*Counsel of Record*
Kevin M. LeRoy
TROUTMAN PEPPER
LOCKE LLP
225 W. Randolph St.,
Suite 2600
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 759-1938 (KL)
(312) 443-0336 (fax)
misha.tseytlin@troutman.com
kevin.leroy@troutman.com

James W. Beers
TROUTMAN PEPPER
LOCKE LLP
401 9th St., NW., Suite 1000
Washington, D.C. 20004
(202) 274-1934
james.beers@troutman.com

Carson A. Cox
TROUTMAN PEPPER
LOCKE LLP
1001 Haxall Point, 15th Floor
Richmond, VA 23219
(804) 697-1338
carson.cox@troutman.com

*Counsel for Petitioners in*
*Case No. 26-1174*

*<u>/s/ Elisabeth S. Theodore</u>*
Jonathan S. Martel
Elisabeth S. Theodore
Samuel I. Ferenc
Charles R. Birkel
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Tel: (202) 942-5000
Fax: (202) 942-5999
elisabeth.theodore@arnoldporter.com

*Counsel for Petitioners in*
*Case No. 26-1168*

## CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to this Court's Order dated September 15, 2026 that the foregoing brief contains 7,989 words, excluding the parts of the filing exempted by Fed. R. App. P. 32(f). I further certify that the filing complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6), respectively, because it was prepared in a proportionately spaced typeface using Microsoft Word for Office 365 in Times New Roman 14-point font.

Dated: October 19, 2026

*/s/ Elisabeth S. Theodore*
Elisabeth S. Theodore

## CERTIFICATE OF SERVICE

I hereby certify that, on October 19, 2026, the foregoing brief was electronically filed with the Court via the appellate CM/ECF system, and that copies were served on counsel of record by operation of the CM/ECF system on the same date.

Dated: October 19, 2026

*/s/ Elisabeth S. Theodore*
Elisabeth S. Theodore